454 So.2d 119 (1984)
STATE of Louisiana
v.
John F. FULLER.
No. 83-KA-0619.
Supreme Court of Louisiana.
June 25, 1984.
Rehearing Denied September 14, 1984.
*120 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Robert Cline, Glen B. Foreman, Asst. Dist. Attys., for plaintiff-appellee.
Emile A. Carmouche, Gretna, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. We find no merit in the two principal issues regarding the guilt phase and therefore affirm the conviction.[1] However, the necessity for development of additional facts relative to excessiveness of sentence causes us to remand the case to the trial court on the sentencing issue for a determination of the competency of counsel's performance at the penalty phase.
The two critical guilt phase issues are (1) whether the trial court erred in permitting the prosecutor to cross-examine defendant concerning the content of a letter written by defendant to his wife, despite his assertion of the marital privilege, and (2) whether the trial court erred in disqualifying a juror during trial and replacing him with an alternate after determining at a contradictory hearing (with all parties present) that the juror had violated the rule of sequestration by leaving his motel room in the evening to go to the motel bar.
Facts
On the morning of January 19, 1981, the body of the victim (who was defendant's mother-in-law) was discovered lying in bed at her home. She had been shot twice in the head. Finding no signs of forcible entry, the police questioned defendant's wife about family members who owned guns and determined that defendant owned a small caliber pistol. The police stated that they planned to speak with both defendant and the victim's other son-in-law.
Shortly thereafter, defendant voluntarily appeared at police headquarters and presented his pistol, which was the same caliber as the bullets removed from the victim's head. Defendant claimed that the *121 pistol had only been used to shoot at targets. He also offered to turn over a magnum cylinder for the pistol, which he did on a return trip to the station shortly thereafter.
The crime lab examined the pistol and discovered a gray human hair and traces of human blood on the barrel. Human tissue was also discovered on the front sight.
Upon request, defendant again returned to the station, where he was advised of his constitutional rights. Agreeing to answer questions, defendant gave an exculpatory recorded statement denying any involvement with his mother-in-law on the day of her death and reasserting that the gun had been used only for target shooting.
After defendant ate a hamburger with the officers, he was again advised of his rights and was informed that human hair, tissue and blood had been found on his gun. At that point defendant began to cry.
An officer then noticed and inquired about a scratch on defendant's hand. Defendant denied knowing how he got the scratch. In response to questions about other scratches, defendant showed officers a rather deep scratch on his stomach, a scratch on the back of his shoulder, and a small scratch on the back of his neck. Defendant told the officer that he thought his 14-month old daughter had given him these scratches.
Upon further questioning, defendant admitted going to the victim's house about 11:00 p.m. on the night of the murder and entering the back door without knocking by use of his wife's key. He also conceded that this was not his usual method of visiting his mother-in-law. He claimed no memory of what transpired after he went to her bedroom, but remembered going out the back door with his gun in his hand.
Continued questioning produced a statement in which defendant remembered the events of the evening, but claimed that his mother-in-law, asleep when he entered her bedroom, thought he was a burglar. She scratched him, tore his shirt, and grabbed his gun, which discharged accidentally. When he tried to pull the gun away, it discharged again.[2] At that point, defendant was formally arrested.
In the meantime, the crime lab conducted an examination of the bank envelope found in the victim's open purse next to her bed and discovered defendant's fingerprints on the envelope. Defendant's wife informed the police that the envelope had contained $80 to $85 on the day of the murder and that she later found $82 in cash hidden in a cabinet in her home. The investigation also revealed that the victim had bruises on her hands and skin under her fingernails.
Defendant was eventually indicted for first degree murder committed during an aggravated burglary. See La.R.S. 14:30 and La.R.S. 14:60. At his trial, defendant denied any involvement, accidental or otherwise, in the victim's death. He testified that his "accidental shooting" story was given to protect his wife, because he assumed she was responsible for killing the victim. He was cross-examined concerning two letters he wrote to his wife while he was in jail, in which he claimed that the shooting was accidental. These letters, of course, contradicted defendant's trial testimony, while being consistent with his final statement to the police. The jury obviously did not believe defendant and found him guilty as charged.
The evidence, when viewed in the light most favorable to the prosecution, was clearly sufficient to sustain the verdict. The jury reasonably concluded that defendant surreptitiously and without authorization entered the victim's home armed with a dangerous weapon, with intent to steal her money, and that he intentionally shot and killed her during the course of this aggravated burglary.
Marital Privilege
Defendant challenges the prosecutor's use in cross-examination of a letter that he *122 wrote to his wife while he was in jail awaiting trial. In the letter he asserted that he had shot his mother-in-law accidentally.
The issue of whether a letter (a written communication) by a defendant to his wife is included within the scope of the "confidential connubial conversation" privilege in Louisiana is not res nova. In State v. Morgan, 147 La. 205, 84 So.2d 589 (1920), this court held that such a letter written by a defendant to his wife was not included within the scope of the statutory privilege for "private conversations between husband and wife". Act 157 of 1916 (then applicable) contained the same language as the present La.R.S. 15:461.[3]
The result in Morgan has been criticized.[4] Nevertheless, we agree that the trial court ruled correctly in permitting the cross-examination about the letter.
Statutory privileges should be given a "genuine" construction. See State ex rel. Sullivan v. Maggio, 432 So.2d 854 (La. 1983). Although privileges serve to foster a relationship (in this instance the husband-wife relationship), they disserve the truth-seeking function of the adversary trial. The Legislature, by continuing to utilize the same "private conversations" language in the 1928 Code of Criminal Procedure and in the Revised Statutes of 1950, was obviously satisfied that excluding oral conversations alone (rather than written messages sent through the mail) was a sufficient price in terms of "truth suppressing" to pay to foster the matrimonial relationship. This was properly a decision made by the Legislature, and the court's role is to follow that decision. If not satisfied with this result, the Legislature can certainly expand the scope of the privilege to include all written and oral communications.[5]
Furthermore, expansive construction of the privilege is particularly inappropriate in this case. Defendant made the assertions about an accidental killing to his wife in an effort to deny culpability for killing her mother. The state introduced the assertions only after defendant's testimony at trial accused his wife of murdering her mother. The statements contained in defendant's letters, being inconsistent with his trial testimony accusing his wife, had substantial impeachment value and diminished the credibility of his accusation against his wife.
In determining the applicability of a privilege, a court should "inquire whether information sought to be excluded is really in the class whose exclusion will advance the policy" sought to be furthered by the privilege. See State v. Aucoin, 362 So.2d 503, 506 (La.1978). In the present case, exclusion does not serve the policy of fostering matrimonial harmony. When a husband on trial for the murder of his wife's mother attempts to place the blame on his wife, prior inconsistent written assertions to his wife ought to be admissible to challenge the credibility of the husband's trial testimony, even if the same statements arguably might be privileged under some other circumstances.
Replacement of the Juror
The jurors were sequestered throughout the trial. During the evening of the next to last day of trial, after all evidence had been presented, one of the jurors disregarded the judge's sequestration order and apparently went to a bar in the motel where the jurors were staying. He had been there for about an hour when the bailiff discovered him and returned him to his room.
*123 The next morning the judge conducted a hearing and conscientiously examined that juror and the other jurors to determine the extent of the transgression. The juror claimed that the only person with whom he conversed was the barmaid. The other jurors testified that they had not discussed the case with anyone.
Although the juror denied discussing the case or the fact that he was a juror with the barmaid, there is no doubt that the juror willfully disobeyed the sequestration order and was not "secluded from outside communication". Confronted with this situation in a capital case (where sequestration is mandatory), the judge chose to replace the transgressing juror with an alternate. Defense counsel objected to this action and moved for a mistrial based on the juror's misconduct.
The trial judge was called upon to decide whether the juror had become disqualified to perform his duties and, if so, what action to take. La.C.Cr.P. Art. 789. The judge acted properly in holding an evidentiary hearing, with all parties present, to determine the existence of a violation of his order, the nature and extent of the violation, and the appropriate solution to the problem.
The juror assured the judge that he did not, while in the bar, compromise his position by discussing the case or his status as a juror. Although a judge under some circumstances may have been satisfied that such a showing overcame the presumption of prejudice flowing from a sequestration violation, the judge in this instance determined that the essential fairness of the proceeding could best be preserved by replacing the juror with the properly qualified and duly selected alternate. Moreover, the judge's decision to replace the juror, rather than to declare a mistrial, was largely justified by the facts that the violation had occurred during the evening recess and that the other jurors had denied that they were exposed to any outside influence possibly resulting from the violation.
The trial court has discretion to utilize the service of an alternate juror, rather than to grant a mistrial, upon a proper finding that this is the best course of action. Thus, when it was shown that a juror was unable to continue to serve because of the physical disability that was involved in State v. Spencer, 446 So.2d 1197 (La.1984), or was "disqualified" from further service because of the blatant display of prejudices and partiality that was involved in State v. Marshall, 410 So.2d 1116 (La.1982), the replacement of the juror with the alternate has been approved by this court.
The trial judge in this case acted in a fair and deliberative manner when he decided that the juror's willful violation of the order by going to the motel bar was a sufficient ground to disqualify him from further service. The judge also considered alternative courses of action. Replacing the juror with the alternate under the overall circumstances was a proper exercise of the trial judge's discretion.
Capital Sentence Review
Supreme Court Rule XXVIII requires this court to review every death sentence to determine the following:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
In recommending the death penalty, the jury found two aggravating circumstances: the murder was committed during the commission of an aggravated burglary and the murder was committed in a particularly cruel, atrocious and heinous fashion. As noted earlier, the evidence is plainly *124 sufficient to support the jury's finding (necessary for both guilt and penalty) that defendant was engaged in the perpetration of an aggravated burglary of his mother-in-law's home when he murdered her. Because this aggravating circumstance is adequately supported, we need not consider whether the evidence also supports a finding that the killing was committed in a cruel, atrocious, and heinous fashion. See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 442 So.2d 1136 (La.1984) (on remand). Because the evidence offered in support of that aggravating circumstance was otherwise admissible, introduction of that evidence did not inject an arbitrary factor into the proceedings.
Although the evidence adequately supports a finding of at least one of the aggravating circumstances relied on by the jury and the present record does not indicate that the sentence was disproportionate or was imposed under the influence of passion, prejudice or any other arbitrary factors, we are hampered in our review for excessiveness by the fact that defense counsel did not offer any evidence in mitigation at the penalty hearing and did not make any argument to persuade the jury to spare defendant's life. After presenting a spirited and thorough defense in the guilt phase, defense counsel presented little in the way of defense in the penalty phase. See State v. Myles, 389 So.2d 12 (La.1979); State v. Felde, 422 So.2d 370 (La.1982); see also State v. Berry, 430 So.2d 1005 (La. 1983).
Because of this consideration, we are disinclined at this stage either to affirm or reverse defendant's death sentence on this record. We cannot, for example, determine on the present record whether counsel's decision not to present evidence in mitigation or to advance arguments in support of a life sentence was a choice dictated following consultation with defendant or was a tactical decision of counsel that such action was the best means of prevailing at the sentencing hearing. Nor can we determine the existence, character and weight of mitigating evidence that might have been available. See State v. Felde, above; State v. Berry, above. Additional factual development would be helpful to the determination of the excessiveness of the sentence.
The rules of this court governing capital sentencing hearings have provided for this type of situation.[6] In State v. Smith, 400 So.2d 587 (La.1981), we affirmed defendant's conviction, but remanded to the trial court under Supreme Court Rule XXVIII, § 5, for development of additional facts (not introduced into evidence at the trial, but contained in the sentence investigation report of the probation and parole agent) and for an initial determination by the trial court of the necessity of a new penalty hearing.[7] Because (among other things) we were "not presently in a position to determine whether failure to call these individuals [who related the facts contained in the sentence investigation report] as witnesses was error or the result of trial strategy and professional judgment", we directed the trial court to conduct a hearing and to determine whether the evidence adduced at the hearing created a reasonable doubt as to the excessiveness of the death sentence.
*125 In the present case, although the question is the competency of counsel and not the sufficiency of evidence of aggravating circumstances, the procedure should nevertheless be the same. Moreover, the apparent motive underlying the remand in Smith was the avoidance of a future postconviction application based on ineffective assistance of counsel for failure to present the available evidence.[8]
After the hearing on remand in this case, the trial judge should determine whether defendant received effective assistance of counsel, despite his attorney's failure to offer evidence in mitigation and to argue to the jury that defendant's life should be spared. See State v. Myles, above; State v. Berry, above; State v. Felde, above. See also Strickland v. Washington, ___ U.S. ___, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[9]
Since defendant's trial counsel may be called to testify as a witness, a new attorney must be appointed to represent defendant at the hearing on remand.[10] If the trial court concludes that a new penalty hearing is required, the trial court should order a new penalty hearing. If the trial court denies relief, defendant may again appeal to this court for review of that decision.
Therefore, defendant's conviction of first degree murder is affirmed, but determination of the excessiveness of his death sentence is pretermitted, and the case is remanded to the trial court for an evidentiary hearing on the effectiveness of counsel, after which the trial court shall decide whether the evidence requires the court to vacate the sentence and to grant a new penalty hearing. If the death sentence is not set aside on remand, defendant may again appeal his sentence.
DIXON, C.J., concurs.
NOTES
[1] Defendant's other contentions lack any arguable merit and are treated in an unpublished appendix, which is part of the official record in this case.
[2] The state presented evidence at trial that a safety device on the gun would have prevented accidental discharge. The pistol is a single action, long barrel revolver which must be cocked and the trigger depressed before the gun can fire.
[3] La.R.S. 15:461(1) provides:

"The competent witness in any criminal proceeding, in court or before a person having authority to receive evidence, shall be a person of proper understanding, but;
"(1) Private conversations between husband and wife shall be privileged."
[4] See 8 Wigmore, Evidence § 2339 (McNaughton rev. 1961).
[5] The Louisiana Law Institute has an ongoing project to propose a Code of Evidence for Louisiana.
[6] Supreme Court Rule XXVIII, § 5 (1974) provides that "[t]he court may remand the matter for the development of facts relating to whether the sentence is excessive ". (Emphasis supplied.)
[7] In Smith, the jury was presented evidence of an unprovoked shooting by a black defendant at a group of white males. The sentence investigation report indicated that there had been a recent confrontation after which the white victim left the group and proceeded toward the black defendant. The additional facts could have been highly relevant to the finding of the aggravating circumstance (creation of risk of great bodily harm to more than one person) and to the existence of mitigating circumstances not disclosed to the jury.

Because the defendant died before the hearing on remand, the case did not come back to this court.
[8] Ineffective assistance of counsel in the penalty phase of capital cases is a recurring problem. In many cases (including this one), defense counsel, after vigorously contesting the guilt phase, has turned the case over to the jury for penalty determination with little additional evidence or argument, perhaps because the emotional and physical strain on the sole defense counsel in the losing effort in the guilt phase lessens his ability to maintain the same performance level in the immediately following penalty phase. Possibly the trial judge can alleviate this problem by appointing two defense attorneys (as many trial judges now do) and by allocating specifically to one the principal responsibility for preparing evidence and argument for the penalty phase.
[9] In defining the content of "reasonably effective assistance", the Court in Strickland stated that a defendant's challenge to the competency of counsel's representation at a death sentence proceeding has two components:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." ___ U.S. at ___, 104 S.Ct. at 2064.
* * * * * *
"When a defendant challenges a death sentence..., the question is whether there is a reasonable probability that, absent the error, the sentencerincluding an appellate court, to the extent it independently reweighs the evidencewould have concluded that the balance of aggravating and mitigating circumstances did not warrant death." ___ U.S. at ___, 104 S.Ct. at 2069.
[10] In order to comply with the spirit of La.C. Cr.P. Art. 512, the new attorney should also have at least five years experience at the bar.