612 So.2d 953 (1993)
STATE of Louisiana
v.
Vinson G. POTTER.
No. 92-K-2552.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1993.
*954 Harry F. Connick, Dist. Atty. of Orleans Parish, David L. Arena, Asst. Dist. Atty. of Orleans Parish, New Orleans, for plaintiff.
Raymond McGuire, New Orleans, for defendant.
Before BARRY, WARD and JONES, JJ.
JONES, Judge.
The State of Louisiana applied to this court on writ of certiorari and prohibition complaining of the trial court's ruling reversing defendant's conviction for second degree murder, a violation of La.R.S. 14:30.1. We granted the State's writ of certiorari and after a review of the record in this matter we affirm the trial court's judgment.
The defendant and the victim, Raymond Lewis, worked together at the post office. On June 13, 1985 they worked the same shift and got off work at about 12:15 a.m. Marion Cummings, a co-worker at the post office, testified that on that date she "punched out" with the defendant at 12:15 a.m. She then walked to the parking garage to her car. As she drove out of the parking lot, she saw the defendant's car parked in the parking lot with its emergency flashers on. The victim, Raymond Lewis, was standing at the rear of the defendant's car on the passenger side. The defendant was walking toward the rear of his car. The defendant and the victim did not appear to be arguing. Ms. Cummings blew her horn at them and drove past them. As she rounded the Superdome, she heard a loud noise that sounded like a gunshot. She looked back and saw the headlights of an approaching car. It was the defendant *955 driving alone in his car. Ms. Cummings planned to ask him what the noise was, but the defendant, as he passed her, looked away from her and sped away.
Two other co-workers, Dwayne Tyler and Cassandra Smith, also heard a gunshot as they were about to leave the parking lot. They ran to where they thought the shot had been fired. They saw Potter's car being driven quickly away and an individual lying on the ground adjacent to where the car had been. Dwayne Tyler reached the body of Raymond Lewis first. Lewis had been shot in the neck and killed.
The police arrived shortly thereafter. Based upon information given to the police by the witnesses, Officer Demma went to defendant's residence, an apartment in a complex located at 10500 Haynes Blvd., and questioned the defendant. The defendant told the officer that he had been present when Raymond Lewis was shot, but that someone, that he did not know, had shot Lewis. This unknown perpetrator told the defendant to go home. The defendant stated that he had gone home and washed the blood from the shooting off his car. The police seized the defendant's car. They found a gun in the trunk of the car. The gun was determined to be the same gun which had fired the shot that killed the victim.
At the trial the defendant admitted that he shot the victim, but contended that the shooting had been in self-defense. He testified that he and Lewis had known each other for several months prior to the shooting, beginning when they both began employment at the post office. They were friendly with each other for the first four or five months and socialized together. During this time, the defendant also became friendly with another co-worker, Beverly Mitchell. Mitchell, Lewis, and the defendant went out together as a threesome. Once the defendant became friendly with Mitchell, Lewis began to interrogate the defendant regarding the nature of the defendant's relationship with Mitchell. Apparently because of the defendant's relationship with Beverly Mitchell, Lewis subsequently became hostile to the defendant. Lewis would run into him when crossing his path in the hallway at work and would sneer at him as if he wanted to intimidate the defendant. The victim was 6 feet tall and weighed 219 pounds; the defendant was 5 feet 8½ inches tall and weighed 135 pounds.
On one occasion, the victim stopped the defendant in the parking lot and asked the defendant what his problem was. The defendant responded that he did not have a problem and the victim walked away. On another occasion at work, the defendant accidentally dropped some mail in front of the victim. The victim said, "I hope you don't expect me to pick those up." The defendant ignored him and walked away. Later that night, the victim followed the defendant home from work. When the defendant answered the door, the victim, looking "wild eyed and crazy," asked him "What is your problem?" The defendant said he didn't have a problem and threatened to call the police if the victim would not leave. Lewis told the defendant that the defendant was going to do something to make him, [Lewis], "f___k him [defendant] up." Lewis then left. After this incident the defendant asked for a transfer to Atlanta, Georgia or Charleston, South Carolina. On the morning of the shooting, June 13, 1985, Mr. Augustine, the defendant's supervisor, told him that he had completed his transfer papers and had given the defendant a good evaluation. He told the defendant that his transfer would probably be approved within the next four weeks.
On the night of the shooting, the defendant accidentally dropped some letters in front of the victim. As before, Lewis said, "I hope you don't expect me to pick those up." The defendant ignored him. Later, a supervisor told Lewis to pick up the letters. Lewis yelled at the supervisor that defendant was the one who had dropped the mail, not him. Later, when the defendant saw the victim in the bathroom, the victim was very angry and called him names. The defendant testified that he delayed leaving for a few minutes at the end of their shift to give the victim time to leave first. The defendant then walked to the parking lot *956 and got into his car. As he was driving out, the victim ran up to the car and asked the defendant to stop. Defendant exited his car. The victim then said, "what is your problem? I told you that you were going to make me f___k you up." The victim then swung at the defendant with his fist. The defendant turned his head so that the victim hit him in the back of his head. The defendant entered his car and attempted to drive across the street, but the car stalled. The victim again approached the defendant as he was turning on his emergency flashers. The defendant reached into the glove compartment, retrieved his gun, and got out of the car. The victim saw the gun and warned the defendant against using the weapon, and he reached in his pocket "as if he had a weapon." (The victim had previously told the defendant that he had a gun.) The defendant, believing that the victim had a gun in his pocket, shot him.
The defendant then went home. His mother and father were there, visiting from Charleston. His girlfriend, Metha Williams, was there. He did not tell his parents what had happened. He took his girlfriend outside to talk to her about the shooting just as the police arrived. The defendant stated that he made the statement to the police that another man had shot the victim because he was scared.
On July 25, 1985, Vinson Potter was charged by indictment with second degree murder. The defendant was represented by retained trial counsel. On April 15, 1986, after trial by jury, the defendant was found guilty as charged and subsequently sentenced to serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
On appeal, the defendant raised three assignments of error: 1) peremptory challenges were improperly used to exclude black members from the jury; 2) the defendant received ineffective assistance of counsel; and, 3) the prosecutor made improper closing arguments. Without resolving assignments 2 and 3, this Court ordered that the case be remanded to the trial court for hearing on the defendant's claims. State v. Potter, 578 So.2d 528 (La.App. 4th Cir.1991). The Louisiana Supreme Court reversed this Court's decision and held that the failure to adhere to the contemporaneous objection rule barred the defendant's later attempt to contest the State's peremptory challenges. State v. Potter, 591 So.2d 1166 (La.1991). The case was then remanded by this Court to the trial court for a hearing to allow both sides the opportunity to present relevant evidence on the ineffective assistance of counsel claim. State v. Potter, 591 So.2d 1390 (La.App. 4th Cir. 1991).
On July 9, 1992, a hearing was held regarding defense counsel's failure to contemporaneously object to the prosecution's alleged misuse of its peremptory challenges in violation of Batson. On September 30, 1992, the trial court ruled that there had been no Batson violation. The trial court then asked defense counsel to "present your case." Defense counsel stated, "I don't think we have to do anything" and the trial court responded, "Make something for the record. This is your case." Defense counsel then offered the entire record in support of the defendant's case. Both sides then submitted the remaining alleged ineffective assistance of counsel claims on the record without any additional evidence or testimony being submitted on those claims. On October 7, 1992, the trial court ruled that the defendant was denied effective assistance of counsel and reversed the defendant's convictions. The State now complains of this ruling.
DISCUSSION
The trial court found that the defendant proved that he was deprived of effective assistance of counsel at trial for the following reasons: 1) counsel failed to investigate, interview and subpoena witnesses, and failed to obtain exculpatory documentary evidence; 2) counsel presented an unsupported theory of a defense; 3) counsel failed to argue the responsive verdict of manslaughter; 4) counsel failed to object to the prosecution's peremptory challenges of black perspective jurors; and 5) counsel's demeanor was professionally questionable.
*957 The two-pronged test to determine whether counsel has been ineffective was set out by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant must show that 1) counsel's performance was deficient, and 2) that the deficiency prejudiced the defendant. Strickland; State v. Fuller, 454 So.2d 119 (La.1984); State v. Petta, 496 So.2d 390 (La.App. 4th Cir.1986), writ denied 533 So.2d 10 (La.1988).
Performance is ineffective only when it can be shown that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Sixth Amendment. Petta. There exists a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 104 S.Ct. at 2065. Defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., 104 S.Ct. at 2068.
1.) Failure to Subpoena Defense Witnesses
The defense asserts ineffective assistance of counsel because the defendant's trial attorney failed to subpoena witnesses who could have corroborated defendant's story and buttressed defendant's defense of self-defense. This issue was addressed at defendant's second motion for a new trial held on April 22, 1988. At the hearing, the defendant testified that he had asked his attorney to talk to:
1. Mr. Augustine, the defendant's supervisor, who could allegedly verify that the defendant asked for a transfer.
2. Melvin St. Clair, another supervisor, who could allegedly verify that, on the night of the shooting, Lewis had gotten angry and screamed at the defendant thirty minutes before the shooting.
3. Teresa Jones, who could allegedly verify an altercation between Lewis and the supervisor.
4. Carolyn Foster, who could allegedly verify that the defendant left after the victim on the night of the shooting.
5. Metha Williams, the defendant's girlfriend, who could have allegedly verified the incident in which the victim came to the defendant's house and threatened him.
Lucille Potter, the defendant's mother, also testified at the hearing. She said that she had told the attorney that Metha Williams would testify for the defendant, but the attorney had told her that Williams' testimony would not help. She further testified that a woman who worked with the defendant and victim at the post office had called her and told her that she would sign an affidavit in defendant's behalf if the defendant's attorney would stop by the post office, but that she would not testify at trial because she was afraid of the victim's family. She testified that she had relayed this information to defendant's attorney.
The defendant's trial attorney, also testified at the motion for a new trial. He stated that the defendant had given him the names of "several people" that the defendant thought would be helpful witnesses for him. Cuccia testified that he contacted these witnesses and found that they were not helpful, were antagonistic, or would not say anything consistent with the defense's theory of the case. He did not specify the potential witnesses given him by the defendant or specify the potential witnesses he allegedly contacted. He testified that the defendant told him specifically that the testimony of Beverly Mitchell would not be helpful to him in any way since the nature of his relationship with her had been very insignificant. He testified that he did not go to the post office to interview defendant's co-workers because the incidents between the defendant and the victim occurred while they were alone.
None of the witnesses named by the defendant or his mother came forward to *958 testify at the hearing on the motion for a new trial. The record does not indicate that they were subpoenaed to appear. However, after the hearing on October 15, 1989, an affidavit was executed by Ms. Metha Williams. In the affidavit, Ms. Williams states that she was at the defendant's house on a Sunday night a month before the shooting when the defendant arrived home from work. Shortly thereafter, someone knocked at the door. Ms. Williams heard a man's voice speaking to the defendant in a loud, angry tone. Ms. Williams recognized the man as the victim, Raymond Lewis. Lewis was "using a lot of profanity directed toward Vinson in a threatening manner." Lewis appeared to be drunk and gave her "the impression that he was at any moment going to do something to hurt Vinson." She stated that she would have testified in the defendant's behalf, but the defense attorney never contacted her regarding a trial date.
This witness's proposed testimony corroborates the defendant's theory of self-defense in that it documents the most serious incident during which the victim harassed and threatened the defendant. It may be the only altercation between the men that was witnessed by another person. It is difficult to determine what effect this testimony might have had on the jury, but it is not unreasonable to conclude, as did the trial court, that this testimony would probably affect the outcome of the trial.
2.) Presentation of "Bogus" Theory of Defense to the Jury
The defense contends that he received ineffective assistance of counsel because trial counsel presented a "bogus theory" of defense to the jury. The trial evidence was presented that a spent bullet was found at the crime scene. The defense attorney questioned State witnesses who had heard a gunshot regarding whether only one shot or two had been heard. He seemed to be suggesting that the spent bullet could have been fired by the victim at the same time that the defendant fired his gun at the victim. No other evidence supported the contention that the victim had a gun. No gun was found on the victim or at the crime scene. The defendant did not testify that the victim actually had a gun. The defense counsel admitted at the motion for a new trial that the defendant had not told him that the victim had a gun. The State in argument suggested to the jury that this theory had been presented by the defense as a smokescreen to keep the jury from addressing the real issues presented.
The defense contends that this "bogus theory" was unreasonable and "outside the wide range of professionally competent assistance" and undermined the defense's argument that the shooting was in self-defense.
In this case, the defense counsel may have suggested this "bogus theory" to create doubt as to exactly what happened at the shooting. However, the decision to initiate this line of questioning was counsel's alone, without input from the defendant. The prosecutor emphasized throughout trial that this was a "bogus theory" unsupported by any evidence or testimony. Counsel's failure to secure witnesses to support the defendant's own story, coupled with this unsupported theory concocted by counsel alone, supports the trial judge's finding that the defendant did not receive effective assistance of counsel.
3.) Defense Counsel Allowed Trial to Become A "Personal Battle" Between Him and Prosecutor
The trial court found that the defendant received ineffective assistance of counsel because his trial counsel "allowed the trial to become a personal battle between him and the prosecutor." The record reflects and the prosecutor stipulated at the motion for a new trial that the trial was "heated." However, the defendant does not demonstrate that, but for his counsel's conduct, a reasonable probability exists that the outcome of the trial would have been different. Because the defendant has failed to meet the Strickland criteria, this assignment is without merit.
*959 4.) Failure to Argue Manslaughter As a Responsive Verdict
The trial court also concluded that trial counsel's failure to argue manslaughter as a responsive verdict constituted ineffective assistance of counsel. Trial counsel's testimony at the motion for new trial indicates that his failure to do so, and to argue self-defense only, was one of trial strategy and because he believed that the defense of self-defense was the truth. However, the decision not to argue manslaughter as an alternative to self-defense appears to be insupportable as the facts could support this lesser verdict and there appears to be no reason not to argue this to the jury. The trial court did not err in concluding that counsel's failure to argue manslaughter as a responsive verdict was ineffective.
5.) Failure to Object to State's Use of Peremptory Challenges To Exclude Blacks From the Jury
The defendant contends that he received ineffective assistance of counsel because his trial counsel failed to object to the State's use of its peremptory exceptions to exclude blacks from the jury.
As noted by the trial judge, this is the weakest of the defendant's arguments because the court found no Batson violation and accordingly, no prejudice to the defendant. This claim is without merit.
The record supports three of the five findings by the trial court that defendant received ineffective assistance of counsel. For the foregoing reasons, the trial court's judgment is affirmed.
AFFIRMED.
WARD, J., concurs with reasons.
WARD, Judge, concurring.
I disagree with the conclusions of the trial court and the majority opinion herein, both holding that Potter was deprived of the effective assistance of counsel within the meaning of Strickland, Fuller, and Petta. I concur only because the trial court is given such vast discretion in considering motions for a new trial. C.Cr.P. art. 851, section 5 gives discretion to the trial court to grant a new trial when "the court is of the opinion that the ends of justice would be served by the granting of a new trial although the defendant may not be entitled to a new trial as a matter of strict legal right." Potter is not entitled to a new trial because of ineffective assistance of counsel. The only question here is whether the trial court abused the wide discretion given to it by virtue of the above statute. I disagree with the conclusions of the trial court, but I cannot not say the decision is such an abuse of discretion that it warrants reversal.