# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-1526

STATE OF LOUISIANA

VERSUS

F.B.A.

************

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT,
PARISH OF ALLEN, NO. CR-05-3813
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and J. David Painter, Judges.

**AFFIRMED.**

**Douglas L. Hebert, Jr.**
**District Attorney**
**Sherron Ashworth**
**Assistant District Attorney**
**Thirty-Third JDC**
**Post Office Box 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward K. Bauman**
**Post Office Box 1641**
**Lake Charles, LA  70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**F.B.A.**

**F.B.A.**
**4001 S. Decatur #37-603**
**Las Vegas, NV 89103**
**IN PROPER PERSON DEFENDANT/APPELLANT:**
**F.B.A.**

PETERS, J.

A jury convicted the defendant, F.B.A.,[1] of aggravated rape, a violation of La.R.S. 14:42, and aggravated incest, a violation of La.R.S. 14:78.1. Thereafter, the trial court sentenced him to serve life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on the aggravated rape conviction and to serve fifteen years at hard labor without the benefit of probation, parole, or suspension of sentence on the aggravated incest conviction. The trial court ordered that the sentences run concurrent to one another. The defendant has appealed his convictions, asserting that the evidence was insufficient to support the convictions and that he was denied effective assistance of counsel at trial. For the following reasons, we affirm the convictions in all respects.

### SUFFICIENCY OF THE EVIDENCE ISSUE

The first assignment of error raised by the defendant's counsel, as well as the first assignment of error raised by the defendant in his *pro se* assignments of error, addresses the sufficiency of the evidence presented by the State of Louisiana (state) in support of the convictions. The basic argument is that the testimony of the victim is so inconsistent that it does not meet the proof beyond a reasonable doubt standard. In fact, the defendant suggests that the testimony is "unreliable, untrustworthy and incredible."

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and

---

[1] In compliance with La.R.S. 46:1844(W), initials are used to protect the identity of the victim.

therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman,* 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

At the time the offenses now before us occurred, La.R.S. 14:42(A)(4) defined aggravated rape in pertinent part as "a rape committed . . . where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed . . . [w]hen the victim is under the age of twelve years." Additionally, La.R.S. 14:78.1 defined aggravated incest as follows:

A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.

B. The following are prohibited acts under this Section:

(1) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.

2

(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

C. Consent is not a defense under this Section.

The record in this matter establishes certain facts that are not in dispute. The individual that the state asserts is the victim in these criminal charges is V.J.L., who was born on December 22, 1989, and is the defendant's step-daughter. V.J.L.'s mother, S.J., is a citizen of the Netherlands and met the defendant while residing in South Carolina in 1997. She and the defendant began cohabiting, and in 1998, the couple had a son, C.M.[2] In that same year, after C.M.'s birth, the family moved from South Carolina to Houston, Texas. In 1999, S.J. and the defendant were married. In 2001, the family moved to Kinder, Louisiana, where S.J. obtained employment at the local casino. Because the defendant continued to work in Houston, he was separated from the family for days at a time.

The first suggestion of any sexual activity involving V.J.L. arose in January of 2002 when S.J. noticed blood in V.J.L.'s underwear.[3] In response to this finding, the defendant[4] took V.J.L. to Dr. Darryl Elias, a Jennings, Louisiana physician, who examined her to determine the cause of this discharge. The defendant remained in the room while Dr. Elias examined V.J.L. Based on his findings, the doctor concluded that V.J.L. suffered from the human papilloma virus (HPV), a sexually transmitted disease which causes genital warts and lesions. According to Dr. Elias, V.J.L's hymen was no longer present and the condition of her vagina and the lesions around her genital area were consistent with sexual intercourse. From the size of the lesions,

---

[2]V.J.L. has a younger brother, B.J.L., who was also born to S.J. before she met the defendant.

[3]V.J.L. had celebrated her twelfth birthday less than a month before her mother's observation.

[4]S.J. had a job interview on the day that V.J.L. saw Dr. Elias.

he estimated that the sexually transmitted disease had been present for six to twelve months prior to his examination. Additionally, the vaginal warts present at the time of his examination extended from the top of the vaginal opening to the rectum. Despite his physical findings, when he questioned V.J.L., she denied having been involved in any sexual activity. Dr. Elias reported his findings to the local office of the State of Louisiana Office of Community Services (OCS) and informed that office of his concerns that V.J.L. had been a victim of molestation.

Although OCS attempted to investigate Dr. Elias' suspicion, the investigation reached no conclusion one way or the other. When interviewed by James R. Lemaire, an OCS investigator, V.J.L. continued to deny any sexual activity, and an interview of S.J. produced no helpful information. Mr. Lemaire did not interview the defendant. Because of V.J.L.'s continued denials and the lack of any other evidence of sexual abuse, Mr. Lemaire closed his file.

Thereafter, the family unit apparently began to disintegrate. In December of 2003, the defendant moved to Las Vegas, Nevada, with another woman. In fact, he returned to Kinder, Louisiana, only one time thereafter. This visit occurred in September of 2004 to celebrate his son's birthday.

In July of 2005,[5] less than one year after her step-father's last visit, V.J.L. informed her mother that her statements to Dr. Elias and Mr. Lemaire were not truthful and that she and the defendant had engaged in sexual activity during that period. S.J. immediately contacted Mr. Lemaire, who interviewed V.J.L. and initiated the investigation that led to the defendant's arrest.

---

[5]V.J.L. would have been sixteen years old at the time.

When the trial on the merits began on July 23, 2007, V.J.L. was seventeen years old. She testified that her sexual involvement with her step-father began after the family moved from Houston, Texas, to Kinder, Louisiana. According to V.J.L., the defendant began by fondling and kissing her, but soon he began using a dildo on her to help her adjust to sexual intercourse. V.J.L. testified that she and the defendant watched pornographic movies during their sexual activity[6] and that he caused her to perform oral sex on him as often as possible. This activity was accepted by her because the defendant told her that what they were doing was normal, that her mother knew about the activity and approved of it, that she was beautiful, and that when she grew up they would run away and get married.

With regard to her denials to Dr. Elias, V.J.L. testified that the defendant had told her to lie about their sexual activity.[7] After Dr. Elias's examination, the defendant stopped having sexual intercourse with her until after her symptoms had resolved themselves.

V.J.L.'s explanation for coming forward with her accusations at such a late date was the influence of her boyfriend, J.L. According to V.J.L., she met and began dating J.L. in 2003, after her step-father left the home. At the time, she was fifteen and he was seventeen. Over several months their relationship became of such a nature that she felt comfortable enough with him to confide in him. When she told him of the defendant's actions, he encouraged her to discuss the matter with her mother. In fact, according to V.J.L., on one occasion when she was talking with the defendant on the telephone, J.L. took the telephone from her and confronted him with

---

[6]In her testimony, S.J. acknowledged that during the time at issue, there was a dildo and pornographic movies in the home.

[7]Dr. Elias testified that he found it unusual that the defendant remained in the room during his examination of V.J.L.

her allegations. The defendant responded that "I would do it again," and hung up. Soon after this telephone conversation, V.J.L. had the conversation with her mother that gave rise to the criminal charges.

In his testimony, J.L. acknowledged that V.J.L. confided in him, but that she only did so some eight months after they began dating. When he initially encouraged her to discuss the matter with her mother, V.J.L. was reluctant to do so. Finally, he gave her the ultimatum that if she did not inform her mother of the defendant's actions, he would. He confirmed V.J.L.'s testimony concerning the telephone conversation with the defendant, asserting that during the initial conversation, he was listening on a separate receiver. According to J.L., the defendant "came on the phone and she asked him why did you do this to me; why did you take my innocence, my childhood, my virginity. And he said if you don't keep your mouth shut I'll do it again." At that point, J.L. stepped into the conversation, and the defendant quickly terminated the telephone call by hanging up.

Sometime after V.J.L's discussion with her mother, she was referred for evaluation and treatment to Terri Theaux, a licensed professional counselor with the Psychology Clinic in DeRidder, Louisiana. Based on her findings in the evaluation, Ms. Theaux concluded that V.J.L.'s history was consistent with that of a sexually abused child.

In contrast to the evidence presented in support of the allegations, D.A.E., who is the defendant's mother, testified that she had visited the family home in Kinder on two occasions and observed nothing indicating a family problem. She described her son as a caring and gentle man who could not have done what he was accused of having done to V.J.L. The defendant's current love interest testified that she and he

6

had a healthy sex life and that during their relationship she had not contracted any form of sexually transmitted disease.

The defendant testified on his own behalf. He stated that he never actually lived in Kinder, Louisiana, was seldom there, and had only bought the house there for the benefit of S.J. and the children. According to the defendant, he never loved S.J., he had married her for the sole purpose of helping her and her children to remain in this country, and everyone understood that he would continue to have other girlfriends in Houston, Texas. The defendant testified that the initial plan was for S.J. and the children to move to Las Vegas, where he would continue to take care of them, but this plan was scuttled when S.J. became aware that he was living with his new girlfriend. According to the defendant, S.J. became very angry and told him he would not be allowed to see his son. The defendant responded to this threat by threatening her with a divorce action wherein he would challenge her right to custody of their son.

With regard to V.J.L.'s accusations, the defendant denied any type of sexual conduct with V.J.L. He also disputed Dr. Elias' testimony that he was present in the examination room with V.J.L. in January of 2002 when Dr. Elias examined her. Furthermore, although he denied the substance of the telephone conversation testified to by V.J.L. and J.L., he acknowledged having a telephone conversation with V.J.L. regarding J.L. According to the defendant, that telephone conversation occurred because he had been informed that J.L. was eighteen and that he had been seeing a thirteen-year-old girl. Based on what he had been told, he informed V.J.L. that he disapproved of her dating J.L. and threatened her with the possibility of J.L. being

7

incarcerated for having sex with his previous girlfriend. He testified that she responded by stating that "she would say that I raped her."

In brief and at trial, the defendant argues that his employment in Houston, Texas, precluded even the opportunity to have abused V.J.L. to the extent she asserted in her testimony.[8] He blames V.J.L.'s accusations on the assertion that she and her mother were angry at him and that as two women scorned, they had concocted the sexual abuse story to prevent him from having access to his son. Obviously, the jury concluded otherwise.

In reviewing the complete evidentiary record, we agree with the defendant that there exist some inconsistencies in the trial testimony. However, the defendant has not pointed to any irreconcilable conflict with the physical evidence. Considering the evidentiary record as a whole, and considering the evidence in the light most favorable to the state, we conclude that a rational trier of fact could have found the essential elements of both offenses proven beyond a reasonable doubt. *Freeman*, 801 So.2d 578. No internal contradiction or irreconcilable conflict with the physical evidence or testimony of the victim exists. Thus, the testimony of V.J.L., which the jury obviously believed, was sufficient to support the convictions. *Dixon,* 900 So.2d 929.

We find no merit in the argument that the evidence is insufficient to support the convictions.

### INEFFECTIVE ASSISTANCE OF COUNSEL ISSUE

In arguing this issue, the defendant, through his appeal counsel as well in his *pro se* assignments of error, asserts that his trial counsel was ineffective because she

---

[8]The defendant points specifically to V.J.L.'s assertion that she had sexual intercourse with the defendant two hundred times.

failed to introduce several important and relevant documents into evidence and failed

to object to prejudicial testimony given by Dr. Elias. He asserts that these errors were

of such significance that the verdict would have been different had they not occurred.

Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. *State v. Prudholm,* 446 So.2d 729 (La.1984); *State v. Johnson,* 557 So.2d 1030 (La.App. 4 Cir.1990); *State v. Reed,* 483 So.2d 1278 (La.App. 4 Cir.1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. *State v. Seiss,* 428 So.2d 444 (La.1983); *State v. Ratcliff,* 416 So.2d 528 (La.1982)*; State v. Garland,* 482 So.2d 133 (La.App. 4 Cir.1986); *State v. Landry,* 499 So.2d 1320 (La.App. 4 Cir.1986).

The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Fuller*, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that he was prejudiced by the deficiency. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. *Strickland, supra,* 466 U.S. at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. *State v. Sparrow*, 612 So.2d 191, 199 (La.App. 4 Cir.1992).

This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks,* 505 So.2d 714, 724 (La.1987).

*State v. Griffin,* 02-1703, pp. 8-10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40, *writ denied,* 03-809 (La. 11/7/03), 857 So.2d 515.

The record in this matter is sufficient for us to rule on the merits of most of the issues raised in this assignment of error. That being the case, and in the interest of judicial economy, we will address those issues that we can and relegate the remaining issues to post-conviction relief proceedings.

The documents the defendant argues should have been admitted into evidence are:

1.  Dr. Elias' progress notes dated January 25, 2002.

2.  The transcript of an interview with V.J.L. conducted by Anna Theus of the Rapides Parish Children's Advocacy Center on July 19, 2005.

3.  The Allen Parish Hospital Emergency Nursing Triage Assessment prepared by Kathy Marler and dated July 18, 2005.

4.  The Office of Community Service Report prepared by Mr. Lemaire and dated July 19, 2005.

5.  The Psychological Assessment Report prepared by Terri Theaux and dated May 28, 2007.

Specifically, he asserts that these documents would have established numerous inconsistencies in the testimony of V.J.L. concerning the nature and frequency of sexual activity with him.

In considering the defendant's argument, we first note that of the individuals listed, only Ms. Theus did not testify at trial. Additionally, while we agree that some of the material found in the documents does reveal inconsistencies in V.J.L.'s testimony, the record establishes that the defendant's counsel cross-examined all of the witnesses concerning the documents' content, thereby placing the issues raised by the documents' content before the jury.

With regard to Dr. Elias, the defendant asserts that his progress notes would have established that the doctor's memory was somewhat deficient when considering the particulars of his examination of V.J.L., as was his knowledge of sexually transmitted diseases. Specifically, he argues that his trial counsel failed to discredit the doctor by establishing that he had forgotten that V.J.L. made a follow-up visit to his office and that the doctor was incorrect when he suggested that men can be tested for HPV when there is no such test. We find no merit in this argument because, assuming Dr. Elias forgot the follow-up visit, and assuming there is no HPV test for a male, those facts would not have discredited his finding that V.J.L. suffered from HPV. Additionally, the record reflects that the defendant's trial counsel, while using the doctor's progress notes, questioned Dr. Elias concerning statements he made in the progress notes, addressing the very issues raised by the defendant.

The defendant had the use of the transcript of Ms. Theus' interview at trial as well. In his brief, the defendant notes that in the interview, V.J.L. stated that she and the defendant had vaginal sexual intercourse more than twenty times, and had anal intercourse and oral sex only once. In contrast, V.J.L. testified at trial that she had sexual contact with her step-father over two hundred times. He further points to statements in the interview where V.J.L. said that she could not remember the first time or the last time she and the defendant had sex and that she also had trouble distinguishing between dreams and reality. He complains that Ms. Theus should have been required to testify at trial concerning the content of her interview. We disagree.

Although Ms. Theus did not testify at trial, she was merely the one who conducted the interview. The defendant had a copy of the transcribed interview before trial, and his trial counsel cross-examined V.J.L. concerning the

11

inconsistencies now complained of by the defendant. Additionally, while Ms. Theaux's report was not introduced into evidence, she testified extensively as to its content, which included the comments in Ms. Theus's interview. Furthermore, the defendant's trial counsel cross-examined Ms. Theaux extensively concerning these statements. Thus, the evidence of the inconsistent statements complained of by the defendant was presented to the jury.

Ms. Marler testified that she was present in the Allen Parish Hospital emergency room on July 18, 2005, when V.J.L. presented herself as a rape victim. According to Ms. Marler, both Mr. Lemaire and S.J. accompanied V.J.L. to the hospital. Testifying from her report, Ms. Marler summarized the admission and examination process and noted that no examination was performed because more than eighteen months had lapsed since V.J.L.'s last sexual contact with the defendant. Although the report contained a notation that V.J.L. was sexually active with her boyfriend, the trial court sustained the state's objection to the admissibility of that information given the fact that no examination had been performed and any evidence of the victim's sexual activity with her boyfriend was not admissible. The defendant does not complain of the trial court's ruling in that respect, and directs us to nothing in the report that, if admitted, would have changed the outcome of the trial.

Mr. Lemaire was also subject to cross-examination by the defendant's trial counsel. A review of his report reflects that anything in it that might have changed the outcome of the trial was discussed through his testimony or the testimony of others. This includes the notation in the report that V.J.L. originally reported that her family life was normal and that she denied any sexual activity whatsoever.

12

Finally, as previously stated, Ms. Theaux testified extensively concerning the content of her report.

Concerning his argument that his trial counsel failed to object to prejudicial testimony from Dr. Elias, the defendant complains in brief that the doctor testified that "he could only recall two other incidents where the biological father or step-father **refused** to leave the examination room, and in both instances the children were determined to be victims of sexual abuse." (Emphasis in the defendant's brief). He asserts on appeal that his counsel's failure to object to this statement left the jury with the impression that he refused to leave the examination room after being requested to do so by the examining physician. We agree with the defendant that he did not refuse to leave the examination room when requested to do so by Dr. Elias and that Dr. Elias did not request that he leave the examination room. Dr. Elias testified only that "[w]e also asked if [V.J.L.] would feel more comfortable if [the defendant] would leave the room. She did not request that he left [sic] the room."

The actual full in-court exchange on the issue of whether Dr. Elias suggested the defendant refused to leave the examination room came after his testimony cited above and involved responses to questions from the attorney for the state. The exchange was as follows:

> Q.  On how many other occasions was it where a male would actually be in the exam room when the female, a young female was being examined?
>
> A.  Only two other incidents that I've had in my practice in seven years.
>
> Q.  And what was[sic] those?
>
> A.  One of them was another case where a step-father refused to leave the room on an examination where she had been, come to find out later on, had been the victim of sexual abuse.

13

Q. Uh huh (yes).

A. And then another one was the biological father that refused to leave the room, and that was also a victim of sexual abuse.

Q. And for those reasons, sir, [the defendant's] presence in the exam room and given your finding sent up a red flag?

A. Yes, sir. That is why we notified the protection services.

The doctor did not state or even imply that the defendant refused to leave the examination room. In response to a question from the state concerning his experience in the area of child sexual molestation cases, the doctor responded with a statement of his only two experiences. As we appreciate Dr. Elias' testimony, he referred the case to the appropriate authorities, not because the defendant refused to leave, but for the mere fact that he stayed. This act on the part of the defendant "sent up a red flag" in his mind. We find that this opinion was rationally based on his perception and was helpful to a clear understanding of why he made the referral. *See* La.Code Evid. art. 701.

In brief, the defendant also states that the record was "replete with numerous instances where trial counsel failed to object to leading questions posed to witnesses by the State." However, he does not specify any single instance where his trial counsel failed to object. Our review of the trial record reveals that the defendant's trial counsel persistently objected to improper questions by the state.

In his *pro se* assignment of error on this issue, the defendant adopts the argument of his appellate counsel, but further suggests his trial counsel was ineffective for the following reasons not already discussed:

Trial counsel was ineffective in her efforts in selecting nonbiased jurors. Six of the individuals that served on the jury were either related to, neighbors of, or previously worked for someone in the District Attorney's Office.

14

Trial counsel failed to call upon character witnesses to testify on my behalf.

Trial counsel failed to allow sufficient time in preparation for the case. At counsel's request, I had four days to spend with her preparing for trial. This was highly inadequate for a case of this severity.

Concerning these issues, we find that the defendant failed to carry his burden of demonstrating that his trial counsel's performance was deficient and that he was prejudiced by the deficient performance.

In his argument concerning his trial counsel's failure to object to certain prospective jurors, the defendant provides this court with no information concerning which jurors he considered biased. He merely suggests that some of the prospective jurors knew individuals employed in the Allen Parish District Attorney's Office and that this fact alone made them prejudicial to his case. The supreme court in *State v. Juniors,* 03-2425, p. 11 (La. 6/29/05), 915 So.2d 291, 306, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006) (citations omitted), stated:

The law in Louisiana is clear that a relationship between a prospective juror and the district attorney does not automatically disqualify the prospective juror from service. The existence of a relationship, even one of blood or marriage, is not sufficient to disqualify a juror unless the facts reveal that the nature of the relationship is such that it is reasonable to conclude it would influence the juror in arriving at a verdict. The law does not require that a jury be composed of individuals who are totally unacquainted with the defendant, the person injured by the offense, the district attorney, or defense counsel. It requires that jurors be fair and unbiased.

Applying the supreme court's rationale in *Juniors*, we find no merit in the defendant's argument on this issue.

When asserting his argument that his trial counsel was ineffective for failing to call character witnesses on his behalf, the defendant does not identify any such individuals. We find no merit in this argument.

15

Finally, the defendant argues that his trial counsel was unprepared for trial and that he personally only had four days in which to prepare with his counsel prior to trial which was, in his opinion, very inadequate. The trial record establishes that the defendant's first counsel of record withdrew from his representation on May 15, 2007, and that his trial counsel was appointed on May 29, 2007. Trial began on July 23, 2007. Therefore, his trial counsel had almost two months to prepare for trial.

United States Constitution Amendment VI and La.Const. art. 1, § 13 guarantee an accused the effective assistance of counsel.

> This right is fundamental to our system of justice and a cornerstone in assuring that defendants receive a fair trial not unduly prejudiced by their counsel's ineffective assistance. 'Effective counsel' has been defined to mean 'not errorless counsel', and not counsel judged ineffective by hindsight, but counsel likely to render reasonably effective assistance.

*State v. Antoine,* 00-564, p. 6 (La.App. 3 Cir. 12/6/00), 774 So.2d 353, 357 (citations omitted).

We cannot address the preparedness issue as matters concerning trial strategy or a trial counsel's preparedness based on the record now before us. Thus, the defendant's claim in that regard is relegated to post-conviction relief proceedings where, if warranted, a full evidentiary hearing may be conducted to develop a record sufficient to consider the issue raised. *See State v. Smith*, 07-468 (La.App. 3 Cir. 10/31/07), 969 So.2d 694. Therefore, we decline to address this issue at this time.

## DISPOSITION

For the foregoing reasons, we affirm the defendant's convictions.

**AFFIRMED.**

16