CHERI HAYDEN

VERSUS

FREDERICK BOUTTE, WARDEN

NO. 22-KH-244

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPLICATION FOR SUPERVISORY REVIEW FROM THE
TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 08-1709, DIVISION "N"
HONORABLE STEPHEN D. ENRIGHT, JR., JUDGE PRESIDING

April 26, 2023

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Jude G. Gravois

**WRIT GRANTED; CONVICTION AND SENTENCE VACATED; NEW
TRIAL GRANTED**
 **FHW**
 **SMC**
 **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/RELATOR,
CHERI HAYDEN
    Charell D. Arnold
    Jee Y. Park

COUNSEL FOR DEFENDANT/RESPONDENT,
FREDERICK BOUTTE, WARDEN
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Anne M. Wallis

**WICKER, J.**

On application for supervisory review, the defendant/relator Cheri Hayden seeks review of the trial court's March 24, 2022 judgment denying her application for post-conviction relief. After thorough review of the record, arguments of the parties and applicable law, we find trial counsel's failure to conduct an adequate investigation of his client's case violates Cheri Hayden's constitutional rights to effective assistance of counsel and a fair trial. For the reasons that follow, we grant Cheri Hayden's writ application, vacate Cheri Hayden's conviction and sentence, and remand the matter for a new trial.

### *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On July 15, 2009, Cheri Hayden was convicted of second degree murder and sentenced to life imprisonment for the killing of Patricia Landry. In the interest of an orderly presentation, the factual background is divided into the following subsections: (1) the events of February 23, 2008; (2) the investigation and arrest of Cheri Hayden; (3) the prosecution of Cheri Hayden; and (4) the 2018 post-conviction investigation by the Innocence Project.

### The Events of February 23, 2008

On February 23, 2008, around 1:30 p.m., Patricia Landry was run over and killed by a person driving a red pick-up truck in the Laborie's Grocery Store parking lot, in Marrero, Louisiana. A woman was seen driving the truck with a man in the front passenger seat and another man in the back seat. Before Ms. Landry was run over, the truck's front seat passenger reached out of the truck, grabbed Ms. Landry's purse, and began to struggle with her over possession of the purse. Ms. Landry was heard yelling for help as she fought for her purse. The truck's male passenger continued to tug on the purse while Ms. Landry held onto its strap. At some point during the struggle, the strap of Ms. Landry's purse broke and Ms. Landry slipped underneath the truck. The truck's back tire rolled over Ms. Landry's back, crushing

her.[1]  The truck then left the grocery store parking lot.

A short distance away, and soon after leaving the grocery store parking lot, the red pick-up truck was involved in a hit and run accident.  Connie Dutriel was driving her vehicle when the truck suddenly pulled in front of her, crossing her lane of oncoming traffic.  The two vehicles collided, but the truck raced away.  Ms. Dutriel pursued the truck until it intentionally reversed into her, resulting in significant damage to her vehicle.

**Investigation and Arrest of Cheri Hayden**

The Jefferson Parish Sheriff's Office ("JPSO") identified three witnesses who saw the truck's female driver: Tabitha Chaisson and Warren Pitre stated they witnessed the crime in the Laborie's parking lot; and Ms. Dutriel claimed she caught a glimpse of the driver during the hit and run accident.  In their initial accounts to JPSO, all three witnesses provided a similar description of the white female driver as having blonde hair and appearing to be in her 20s or early to mid-30s.

At 4:45 p.m. on the day of the crime, Ms. Chaisson gave a recorded statement to the lead JPSO investigator, Lieutenant Donald Meunier.  Ms. Chaisson provided an account of what she witnessed that afternoon in the grocery store parking lot.  She described the female driver as a "skinny," "very pale" white woman with "strawberry blonde hair," "bluish green eyes," and in her "mid-thirties."  She also described the front seat male passenger who was trying to steal the victim's purse and recounted how she tried to help the victim.

At 5:00 p.m. on the same day, Ms. Dutriel also provided JPSO a recorded statement.  She stated that the driver was a "young girl about in her twenty's," "maybe her middle-late twenty's [sic] early thirties" with "light-colored" "blonde…brown hair," and that she was wearing sunglasses at the time.

---

[1] The autopsy report indicated that Ms. Landry was pronounced dead at 2:12 p.m. and died as the result of multiple blunt force injuries, including rib fractures, a spinal fracture, and collapsed lungs.

JPSO also located a witness shortly after the crime in the grocery store parking lot who recognized the male front seat passenger as a distant acquaintance. Bonnie Gras, who operated a shrimp stand in the Laborie's parking lot, saw the truck leave the parking lot and was able to identify Michael Coe as the front seat passenger of the truck. She made her identification at 12:38 a.m. on February 24, 2008.

At this stage of the investigation, JPSO did not have any leads as to the location of the truck, the owner of the truck, or the male occupant observed in the truck's backseat.

Nevertheless, based on the identification of Michael Coe, investigators conducted a computer database search to identify any white female associates of Mr. Coe who could have been with him during the crime. Investigators learned that eight days prior, on February 15, 2008, JPSO had stopped Mr. Coe and Cheri Hayden for a traffic violation. Because Cheri Hayden was a white woman with blonde hair, who had some affiliation with Mr. Coe, officers decided to compile a photo line-up that included Cheri Hayden. At the time of the crime, Cheri Hayden was 45 years old, with deep facial lines.

Between 12:38 a.m. and 1:51 a.m., JPSO developed a photo array of six women who "generally fit the same physical descriptions" as Cheri Hayden. JPSO specifically focused on white females "with certain length hair and certain color hair; blond [sic] hair." Lieutenant Meunier testified at trial that they "opted to go with black and white" photos because Cheri Hayden's photo "seemed distinctive." He added that he "thought it would be prudent to use the black and white because of the hair color…there were dramatically different shades; and the eye color too."

Shortly after compiling the photo line-up, multiple JPSO officers arrived at Ms. Chaisson's residence, sometime in the 1:00 a.m. hour, to conduct an identification procedure. Lieutenant Meunier administered the photo identification. At approximately 1:51 a.m., Ms. Chaisson positively identified Cheri Hayden as the

driver of the red pick-up truck. Ms. Chaisson also identified Mr. Coe as the front seat passenger who grabbed the victim's purse.

Based on Ms. Chaisson's identification, JPSO obtained an arrest warrant for Cheri Hayden. At approximately 7:30 a.m., investigators effected the arrest of Cheri Hayden at her family's trailer home. The officers also conducted a search of the home; however, the search yielded no evidence connecting Cheri Hayden to the crime. At the time of Cheri Hayden's arrest, less than 24 hours after the crime, JPSO had yet to locate the truck used to commit the crime, did not know who owned the truck, and did not know the identity of the back seat passenger in the truck or his relationship to the other occupants.

After her arrest, Cheri Hayden agreed to speak with investigators and offered a detailed account of her whereabouts throughout the day in question. She explained that on February 23, 2008, she was at her father's residence sometime after 12:00 p.m., where she "bathed and begun preparing food for a barbeque and birthday party for her granddaughter." She told investigators that she remained at the party from around 3:00 p.m. until around 8:00 p.m., leaving only briefly to purchase additional party supplies sometime between 4:00 p.m. and 5:00 p.m. Cheri Hayden acknowledged knowing Mr. Coe for 35 years, but denied any knowledge or involvement in the crime. Investigators also interviewed two individuals Cheri Hayden stated she was with on the day of the crime. Both individuals corroborated her statement to investigators that Cheri Hayden was preparing for and attending her granddaughter's birthday party on the day of the crime.

JPSO subsequently received an anonymous tip that Matthew Vinet was potentially involved in the homicide. JPSO discovered that Mr. Vinet owned the red pick-up truck and after inquiring about its whereabouts, Mr. Vinet led officers to the truck, which officers observed being cleaned with bleach. Mr. Vinet initially denied any involvement in the crime. However, after being presented with "certain

investigative suspicions," Mr. Vinet admitted he was in the backseat of the truck during the purse snatching and had relocated the truck as a result. Mr. Vinet gave JPSO his account of the events of February 23, 2008, which implicated Cheri Hayden. Mr. Vinet was arrested for accessory after the fact to second-degree murder.

After Cheri Hayden's arrest, JPSO called Ms. Dutriel to the detective's bureau for an identification procedure. The day before, Ms. Dutriel had described the driver as a "young girl about in her twenties." Nevertheless, JPSO showed Ms. Dutriel a photo array of women visibly older than the description she gave to police. Ms. Dutriel identified Cheri Hayden from the lineup.

**Prosecution of Cheri Hayden**

The State's case relied on eyewitness testimony, offering no physical evidence connecting Cheri Hayden to the crime. The State's key witness was Ms. Chaisson, who identified Cheri Hayden as the driver of the truck that ran over and killed the victim. Ms. Chaisson testified at trial that she heard someone yelling for help in the parking lot of Laborie's Grocery Store in Marrero. She ran towards the yelling and observed a male leaning out of the passenger-side of a truck trying to steal a woman's purse. The woman, who was later identified as Patricia Landry, was still holding onto the purse's strap while the male passenger continued to tug on the purse. Ms. Chaisson testified that it appeared the truck was being used as leverage, as the driver was starting and stopping it. Ms. Chaisson testified that she was fearful that the victim would be run over by the truck, so she tried to pull Ms. Landry back, and at the same time tried to push the male passenger away, and yelled for them to let go. According to Ms. Chaisson, the driver then cut the wheel to leave, resulting in Ms. Landry falling underneath the truck and being run over as the truck drove away.

The State also called Ms. Dutriel at trial, who testified that she was in a car accident with a red pick-up truck. She stated that she saw the driver who collided

with her vehicle. Ms. Dutriel described the female driver as wearing sunglasses and having "two-toned" hair, which she further described as a mix of brown and blonde with the lighter shade on the bottom. Ms. Dutriel was also questioned about the age of the driver, and she testified that the driver was "in between her twenties and thirties."

Matthew Vinet, the truck's back seat passenger at the time of the crime, also testified for the State and against Cheri Hayden. Mr. Vinet testified that at that point in time, he was living with his long-time girlfriend, Jessica Billiot, and a friend named "Will." On the morning of the crime, he was driving his red pick-up truck when he saw Mr. Coe and Cheri Hayden on the side of the road and decided to stop. Mr. Vinet admitted that on that day, he was drinking heavily and was high at the time. After stopping, Mr. Vinet climbed into the back passenger seat, Mr. Coe sat in the front passenger seat, and Cheri Hayden began driving the truck. He testified that they rode around smoking crack cocaine prior to the crime. Mr. Vinet described the purse snatching incident and the subsequent hit and run. He indicated that when he left the house earlier that day and later encountered Mr. Coe and Cheri Hayden, his girlfriend and their roommate, Will, had gone to Walmart with Will's mother. Mr. Vinet denied Jessica Billiot ever having blonde hair and testified she was not in the truck at any point on the day of the crime.

Additionally, Lieutenant Meunier testified at trial that he conducted the identification procedure with Ms. Chaisson and also obtained Mr. Vinet's identifications of Mr. Coe and Cheri Hayden. At trial, the results of DNA testing performed on cigarettes found in Mr. Vinet's pick-up truck were introduced into evidence. The DNA found on the cigarettes matched the DNA of Mr. Vinet and his girlfriend, Jessica Billiot. Lieutenant Meunier explained that he was not surprised that DNA found in the truck was linked to Mr. Vinet, as he was the owner of the truck. The lieutenant similarly testified that he was not surprised that Jessica

Billiot's DNA was found in the truck because she told the police she used Mr. Vinet's truck. At trial, Lieutenant Meunier was asked if Jessica Billiot "was ever a suspect or was she ever identified by anyone as a suspect in this murder investigation." Lieutenant Meunier replied, "[n]o, she was not." The lieutenant was then asked to describe Jessica Billiot and identify photographs of her. Lieutenant Meunier described Jessica Billiot as a white female, with brunette hair, and in her twenties. He further testified that Jessica Billiot did not resemble Cheri Hayden in any way.

## Cheri Hayden's Defense at Trial

In addition to testifying herself at trial, Cheri Hayden presented the testimony of three alibi witnesses: her father, her father's wife, and her daughter. Although their testimony varied as to the precise time the events of the day took place, they each consistently testified and corroborated Cheri Hayden's testimony that she was preparing for and helping to set up her granddaughter's birthday party on the day in question.

Cheri Hayden's father, Walter Breaux, testified that on February 23, 2008, his daughter was at his home taking a bath around 1:00 p.m. and making potato salad before leaving for the birthday party. Cheri Hayden's father also testified that he recalled Cheri Hayden sleeping at his home the night before the party.

Mr. Breaux's wife, Judith, testified that she had attended church and gone to the store to buy birthday presents on February 23, 2008. When she returned from church at 1:30 p.m., Cheri Hayden was in the bathroom, and Mr. Breaux was making potato salad. She stated that Cheri Hayden left for the party with the potato salad shortly before 2:00 p.m. The party was scheduled for 3:00 p.m., so Ms. Breaux arrived at the party around 2:50 p.m., but Cheri Hayden was running errands at that time. She indicated that Cheri Hayden was running errands for the party because when it came to party planning, they could not depend on Cheri Hayden's daughter.

Cheri Hayden's daughter, Amy Hayden, stated that on February 23, 2008, she was hosting a birthday party for her daughter. The party was originally scheduled for 2:00 p.m. but because things were not ready, she moved the party to 3:00 p.m. Cheri Hayden arrived at Amy Hayden's house a little before 2:00 p.m. and stayed with the children while Amy Hayden ran errands for the party. Amy Hayden testified that while her mother stayed with the children, she went to pick up the cake at Laborie's and "heard an old lady had gotten hurt," but that she did not notice any police cars. Amy Hayden further testified that at around 3:00 p.m., her mother started the barbeque, and after they ran out of ice cream, her mother, Cheri Hayden went to Laborie's for more ice cream sometime around 4:00 p.m.

Cheri Hayden testified in her own defense. She stated that the night before the party, she stayed at her friend Jill Perez's house, and on the next day returned to her father's trailer sometime between 12:30 p.m. and 12:45 p.m. She explained that she began making potato salad for the party. While the potatoes were boiling, she showered, and by 1:30 p.m., her father's wife returned from church. Cheri Hayden testified that she left her father's place at around 2:30 p.m., stopped to pick up party hats at a video store, and arrived at the party at around 2:45 p.m. At trial, the State confronted her with alleged discrepancies between her trial testimony and her statement given to the police on the day after the crime. Cheri Hayden's statement to police indicated that she went to Laborie's between 4:00 p.m. and 5:00 p.m. and that "[e]verybody was talking about what happened in the parking lot."

The last witness called was Jessica Billiot. She testified that on February 23, 2008, she was with Mr. Vinet in the morning, but that she was not with him in the afternoon. She testified that she had been in Mr. Vinet's truck that morning, but not between the hours of 1:00 p.m. and 3:00 p.m. Jessica Billiot was also questioned about where she went that day. Cheri Hayden's trial counsel asked Jessica Billiot, "Let me ask you this. Were you shopping with your Mother that day?" Jessica

Billiot replied, "[n]o; with William's mother." Moreover, she told the jury that she had never had blonde hair.

**Trial Verdict and Sentence**

Following the three-day trial, on July 15, 2009, the jury found Cheri Hayden guilty of second degree murder. In accordance with the jury's verdict, on July 23, 2009, Cheri Hayden was sentenced to life imprisonment without the benefit of parole.

**Subsequent Appeal and Application for Post-Conviction Relief**

Cheri Hayden appealed her conviction, claiming the trial court erred in failing to sever her case from her co-defendant's. This Court affirmed Cheri Hayden's conviction and sentence in May 2010, and the Louisiana Supreme Court denied her writ of certiorari in January 2011.[2] In January 2012, Cheri Hayden filed a *pro-se* post-conviction relief application seeking review of the trial court's denial of her request for transcripts and the District Attorney's file and the denial of her motion to sever. The trial court denied her application in April 2012, and her subsequent writ application to this Court was denied as untimely in July 2012.

In August 2018, Cheri Hayden filed her first counseled application for post-conviction relief. The trial court denied Cheri Hayden's 2018 application on procedural grounds, which this Court affirmed on supervisory review in May 2019. Cheri Hayden then sought a writ of certiorari with the Supreme Court in June 2019.

On January 15, 2021, while her writ with the Supreme Court was still pending, Cheri Hayden filed a second application for post-conviction relief in the trial court, based on additional new evidence related to her actual innocence claim.[3] On April 13, 2021, the Supreme Court granted Cheri Hayden's writ of certiorari, finding the

---

[2] *See State v. Hayden*, 09-954 (La. App. 5 Cir. 5/11/10), 41 So.3d 538, *writ denied*, 10-1382 (La. 1/14/11), 52 So.3d 899.

[3] The trial court subsequently granted Cheri Hayden's request to convert her January 15, 2021 post-conviction relief application to a supplement to her 2018 application. Cheri Hayden also filed a second supplemental application to address La. C.Cr.P. art. 962.2, as it relates to her actual innocence claim, which was enacted while her application was pending.

evidence newly discovered and ordered the matter remanded to the trial court for an evidentiary hearing on the claims raised in Cheri Hayden's application for post-conviction relief.[4]

**Evidentiary Hearing on Post-Conviction Relief**

A two-day evidentiary hearing was held in February 2022, during which Cheri Hayden presented evidence in support of her claims that: (1) the State withheld *Brady*[5] evidence; (2) the State presented false testimony; (3) she received ineffective assistance of counsel; (4) the right to counsel and due process violations warrant granting her a new trial; and (5) she is actually innocent of the crime for which she was charged and convicted.

Since her arrest, Cheri Hayden has maintained her claim that she is innocent. She alleges on post-conviction relief that newly discovered evidence raises doubts about the sufficiency of JPSO's investigation, the credibility of the State's star witness, Tabitha Chaisson, and the reliability of Ms. Chaisson's identification of Cheri Hayden as the perpetrator of the crime. The Innocence Project of New Orleans ("IPNO") obtained the following evidence in the course of its investigation of Cheri Hayden's case and presented it at the February 2022 evidentiary hearing.

*Warren Pitre's Testimony*[6]

---

[4] *Hayden v. Boutte*, 19-968 (La. 4/13/21), 313 So.3d 971 (*per curiam*), *reh'g denied*, 19-968 (La. 6/8/21), 2021 WL 2327983.

[5] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

[6] At the post-conviction hearing, the trial court *sua sponte* removed Mr. Pitre from the witness stand, citing concerns that Mr. Pitre was not competent to testify where Mr. Pitre could not recall his cell phone number and mistakenly represented that a business card he brought with him was given to him by one of the investigating officers involved in this case. The hearing transcript demonstrates, however, that neither the State nor the defense moved to disqualify Mr. Pitre's testimony. Moreover, despite the defense's request to do so, the trial court denied either party the opportunity to question Mr. Pitre as to his mental acuity. The trial court declared Mr. Pitre "not competent to testify" and "dismissed from court."

The trial court's dismissal of Mr. Pitre without allowing him to be rehabilitated through re-direct was error. *See* La. C.E. 601; A witness's mental acuity is not the test of competency. "Understanding, not age, is the test of whether any person shall be sworn as a witness. A key determination to be made is whether the witness is able to understand the difference between truth and falsehoods." *State v. Edgar*, 12-0744 (La. App. 4 Cir. 9/18/13), 140 So.3d 22, 36, *writ denied*,13-2452 (La. 4/4/14), 135 So.3d 638. "[A] so-called insane person may testify if he is able to report correctly the matters to which he testifies and if he understands the duty to speak the truth." *Id.* (citing *State v. Morris*, 429 So.2d 111, 120 (La.1983)); *State v. Woodberry,*14-0476 (La. App. 4 Cir. 6/3/15), 171 So.3d 1082, 1096, *writ denied*, 15-1245 (La. 6/17/16), 192 So.3d 770. While the trial court disregarded Mr. Pitre's testimony and discounted him as a witness, there is scant evidence that Mr. Pitre lacked the mental acuity to testify. At the time of the hearing, Mr. Pitre was in his 80s and displayed generally sound memory. Mr. Pitre appeared only to suffer from a

JPSO identified Warren Pitre as an eyewitness to the crime in the Laborie's parking lot. He testified at the evidentiary hearing that, following the crime, he spoke with officers on the scene; he recalled that there was a male in the passenger seat and "a young lady driving the truck;" he testified that the woman driving the truck was "a blonde-headed young girl;" he stated that she was driving and yelling at the male in the front seat to "hurry up." He further testified that the female driver was in her twenties. Mr. Pitre indicated that he actually provided a description of the woman's age to two different officers. Mr. Pitre stated that he did not have a direct view of the driver's face, but explained that he saw the side profile of her face.

Additionally, Mr. Pitre testified that he did not see Tabitha Chaisson helping the victim in the parking lot, as Ms. Chaisson had claimed. He testified that he was called to testify at the pre-trial suppression hearing. He testified that while waiting to testify at the motion hearing, he overheard Ms. Chaisson's account of the crime. He testified that at that point, he alerted the woman who was coordinating the State's witnesses that Ms. Chaisson was not present on the scene acting as he overheard her describe, and that he never saw Ms. Chaisson on the scene. He testified at the evidentiary hearing that after expressing his concerns regarding the truth of Ms. Chaisson's account of events to the State's witness coordinator, the witness coordinator did nothing.

The record also reveals that months after the February 28, 2008 murder, on October 13, 2008, Mr. Pitre provided Lieutenant Meunier with a recorded statement in which he detailed what he witnessed in the grocery store parking lot. While Mr.

_____

momentary inability to remember his cell phone number and a mistaken belief that a business card he found in his desk at home and brought with him to court was given to him by police in 2008, during the course of the investigation. Mr. Pitre's testimony at the evidentiary hearing was consistent with what he told the investigating officers in 2008, consistent with his testimony at the November 2008 pre-trial suppression hearing, and consistent with what he told IPNO as part of its 2018 investigation. Although he had difficulty recalling his cell phone number and erroneously attributed a business card from the Attorney General's office as a card he received from police in this case, Mr. Pitre was able to understand the specific questions related to the events of February 23, 2008, and was able to recall with sufficient particularity what he observed in the grocery store parking lot, what he told police, and what involvement he had as a witness in the State's prosecution of Cheri Hayden.

Pitre described the female driver as having blonde hair, Lieutenant Meunier did not ask Mr. Pitre what the approximate age of the driver was. Mr. Pitre was then asked to identify the male front seat passenger from a six-person photo array. He positively identified Michael Coe. However, Lieutenant Meunier did not ask Mr. Pitre to make a similar identification of the female driver. Mr. Pitre was not called to testify at trial.

*Tabitha Chaisson's Testimony*

After being advised of her Fifth Amendment rights at the evidentiary hearing, Ms. Chaisson testified regarding the circumstances surrounding her identification of Cheri Hayden. She testified that JPSO officers arrived at her home in the middle of the night, less than 12 hours after the crime, to conduct an identification procedure. Ms. Chaisson testified that when the officers showed up at her house, they appeared "eager," and that "[t]hey wanted to put these people in jail." She stated that when she was initially shown the photo array of women to choose from, she "didn't honestly feel like they were the right age." She recalled that "the majority of them looked…too old." Ms. Chaisson testified that the women in the photo array appeared in "their 50s plus." She told the officers "she couldn't pick anybody on the dot." Ms. Chaisson testified that she got the sense the police wanted her to identify someone. She recalled "[o]ne cop…had his thumb right beside the one picture," and she "got the feeling that that was who they wanted…like, they knew something that I didn't."

Ms. Chaisson admitted that the police did not tell her she had to identify someone; however, she testified that with the officer's thumb next to the photo, she believed that was the person they wanted her to select, and she did. She testified that the identification procedure was "very odd" and that "there seemed to be a lot more people in [her] house than should have been." Ms. Chaisson admitted that she lied at trial. She explained that because of the circumstances of the identification

procedure, the officers arriving in the middle of the night, appearing eager to apprehend the perpetrators, the officer placing his thumb next to one of the pictures, and her desire to help with the investigation, she convinced herself that she identified the correct person. Ms. Chaisson testified, however, that she knew "in [her] gut, that [she had] known this since it happened" that "it was not Cheri Hayden."

*Lieutenant Donald Meunier's Testimony*

Lieutenant Meunier testified that he conducted the photo identification with Ms. Chaisson. He testified that Ms. Chaisson did not indicate that the women in the photos were older or that she could not identify the female perpetrator. He stated that he never placed his thumb on a photo of Cheri Hayden, nor asked Ms. Chaisson if she was sure she could not make an identification. Lieutenant Meunier also testified to his process for creating the six-person photo array that included Cheri Hayden's photo. He testified that the six-person photo array was designed around Cheri Hayden. He stated that the array was based off of Cheri Hayden's photograph and inclusion of five people with similar characteristics "would be the goal." Lieutenant Meunier testified that the photo array was not based on the descriptions given by the eyewitnesses. The lieutenant indicated that he and another investigating officer conducted the identification procedures. Lieutenant Meunier admitted that practices implemented to ensure more reliable identifications were not used in this case; he did not conduct a blind identification procedure; and he did not record the initial identification.

Lieutenant Meunier also testified that months after the crime, on October 13, 2008, he spoke with Mr. Pitre about what he witnessed and took his recorded statement. He recalled that Mr. Pitre did not indicate to him that the driver was young. Lieutenant Meunier testified that Mr. Pitre spoke with officers at the scene in February 2008. He further admitted that in February 2008, JPSO did not realize that the patrol division officers had spoken with Mr. Pitre due to "communication

breakdowns."

Further, Lieutenant Meunier admitted that he received an anonymous tip about an individual named "BJ," later identified as Barbara Jean Williams,[7] having information about the crime. He testified that his source conveyed rumors that Jessica Billiot was the driver and that, in fact, Jessica Billiot had confessed to Barbara Williams that she was the driver. Lieutenant Meunier stated that officers investigated the tip and interviewed Barbara Williams, but that she denied Jessica Billiot had ever confessed to any involvement in the crime to her. Lieutenant Meunier testified that Jessica Billiot was never considered a suspect. He also admitted, however, that Jessica Billiot was advised of her *Miranda* rights and signed a JPSO arrestee/suspect waiver of rights form.

*IPNO Investigator Devon Geylin's Testimony*

Devon Geylin, an investigator for IPNO, testified at the evidentiary hearing that she was responsible for investigating Cheri Hayden's alibi. She testified that she spoke with the State's witnesses, including Connie Dutriel, the victim of the subsequent hit and run accident. In her affidavit, Investigator Geylin attested that she learned that Ms. Dutriel was instructed to report to the JPSO Detective's Bureau for an identification procedure because the police had "found the suspects." At the evidentiary hearing, Investigator Geylin testified that she learned that, "although [Ms. Dutriel] had initially described the driver of the truck as a woman in her 20s or early 30s, when she saw the lineup presented by the police, she knew that the driver was actually an older woman because all the women shown in the lineup were older than that age." Ms. Dutriel thought that Cheri Hayden looked older than the driver she described as "young," in between her 20s and 30s; Ms. Dutriel thought Cheri Hayden looked like she was in her 50s or 60s. Ms. Dutriel selected Cheri Hayden's photograph from the line-up. Ms. Dutriel also told Investigator Geylin that she

---

[7] Barbara Williams is a close materteral friend of Jessica Billiot.

rationalized that the driver must have been older than the description she had given to police.

*Linda Gordon Billiot's Testimony*

Linda Gordon testified that she did not know Jessica Billiot and, despite having the same last name, they were not related.[8] She testified that she had known Mr. Vinet and his family since childhood; that she considered him to be a "vile person;" and that she was aware that he treated women poorly. Ms. Gordon recalled that in 2008, Mr. Vinet had a girlfriend, and though she did not know her by name, she had seen her a few times and recognized Jessica Billiot as Mr. Vinet's girlfriend. She testified that sometime after the crime, she was visiting Barbara Williams ("BJ") at her house, and Jessica Billiot was there. Ms. Gordon described Jessica Billiot as a "nervous wreck" and "terrified." Ms. Gordon testified that Jessica Billiot was dyeing her hair and explained to her and Barbara Williams that she had to dye her hair, because "her hair was similar to Cheri Hayden's hair color." Ms. Gordon testified that Jessica Billiot spoke about the crime and admitted that "she was in the vehicle." Jessica Billiot told the ladies that the police were looking for a girl with strawberry blond hair, so she was trying to dye her hair so it did not look like Cheri Hayden's. Ms. Gordon testified that at the time, Jessica Billiot had "strawberry blond," "reddish orange" hair, and she was trying to "dye her hair dark."

Ms. Gordon stated that she "was trying to put two and two together when [she] was sitting there. And then when [she] realized what everything was doing [sic] … [she] got out of there." Ms. Gordon further testified that she did not go to the police with this information because she was a "single woman with two kids" and "[t]hese are dangerous people." Ms. Gordon testified that when Jessica Billiot admitted to being involved, she was scared for herself and her children. She stated that "[she] wanted to get out of there and go home and pretend like it never happened."

---

[8] For ease of discussion, we refer to Linda Gordon Billiot as Linda Gordon throughout the instant opinion.

Additionally, Ms. Gordon testified that earlier in the same week that the crime took place, she happened to see Cheri Hayden. She knew Cheri Hayden from their time in school together. She testified that they spoke briefly and that Cheri Hayden mentioned she was staying with Jill Perez, a couple of trailers down from Ms. Gordon's property.

Sometime after Jessica Billiot confessed to her and Barbara Williams, Ms. Gordon was doing repair work to her trailer when she ran into Jill Perez. She was aware that Jill Perez had been talking with the District Attorney's office in connection with Cheri Hayden's case. Ms. Gordon testified that she "told [Jill Perez] what happened and said if they need to speak to me, I'm right here at the trailer." Ms. Gordon testified that before IPNO contacted her, no one representing Cheri Hayden ever spoke to her about this case. She testified that "[i]f anybody would have talked to me, I would have told them."

*Reina Rodriguez's Testimony*

Jessica Billiot's cousin, Reina Rodriguez, also testified at the evidentiary hearing. She testified that Jessica Billiot dyes her hair a lot and that Jessica Billiot's boyfriend at the time was "always aggressive" and "abusive to [Jessica Billiot]." Ms. Rodriguez testified that in 2008, while visiting her aunt and Jessica Billiot's mother, Betty Billiot, Jessica Billiot "came in packing a bag" and saying "I gotta go, I gotta go, I can't tell you." Ms. Rodriguez asked Jessica Billiot what was wrong, and she responded "I don't know, we hit something." Ms. Rodriguez stated that she did not know who "we" referred to, but she knew that Jessica Billiot usually drove with her boyfriend in his truck. Ms. Rodriguez testified that Jessica Billiot told her they "ripped somebody off," and "they took her purse." Ms. Rodriguez described Jessica Billiot as appearing "really nervous" and "edgy." She further stated that Jessica Billiot was "out the door so quick."

*Patricia Pavia's Affidavit*

Cheri Hayden also introduced the sworn affidavit of Patricia Pavia, Reina Rodriguez's mother and Jessica Billiot's aunt.[9]  In her affidavit, Ms. Pavia stated that "between three to six months after the crime," she learned from her daughter, Reina Rodriguez that Jessica Billiot confessed to her involvement in the crime in the Laborie's parking lot.  She also attested that "[a]t some point after Reina told me this about Jessica, a girl I did not know came to see me at my house [and] told me that her mom had been arrested for the crime…I told this girl what I knew.  I told the girl who came to my house that Jessica had committed the crime. This girl never came to my house again."

Ms. Pavia attested that she then reported this information to the "Westwego Police Department on Avenue A"; she spoke to a uniformed police officer she described as a "stocky white man with glasses and dark hair;" Ms. Pavia attested that she reported the information to the police officer, but he did not take notes or record her statement; he simply stated that "they had it taken care of."  Although Ms. Pavia could not recall the exact day she reported this information to the police, she attested that it was "before the trial of the people that were arrested for the Laborie's crime." Ms. Pavia also stated that no one other than Cheri Hayden's daughter in 2008, and IPNO Investigator Geylin in July 2018, ever contacted her in regards to the crime. She attested that "[i]f someone else had come to talk to [her], [she couldn't] think of a reason why [she] wouldn't have said the same things [contained in her affidavit]."

*Joseph Billiot's Testimony*

Joseph Billiot, Jessica Billiot's father, testified at the evidentiary hearing.  In 2008, his daughter and Mr. Vinet were always together.  When he first learned that Mr. Vinet's truck was used in the crime at Laborie's grocery store, he testified that he was worried his daughter was involved.  He testified that the morning after the

---

[9] Ms. Pavia died in the years between the filing of Cheri Hayden's 2018 application and the evidentiary hearing.

crime, he "went to check on Jessie." He tried to find out from his daughter if she was involved in the crime, but "she didn't really want to talk to [him] about nothing," which he found unusual because "Jessie normally came to [him], told [him] pretty much everything." Mr. Billiot testified that at the time the crime took place, Jessica Billiot was not with him or his wife; that he was never questioned by or gave a recorded statement to the police; and that Jessica Billiot often dyed her hair.

*Hope Comeaux Verbois' Testimony*

Hope Comeaux Verbois is the mother of William Thompson, Jessica Billiot's roommate in February 2008. Ms. Verbois testified at the evidentiary hearing that her son lived with Jessica Billiot and her boyfriend, Mr. Vinet, and that she recalled Jessica Billiot having blond hair at the time. She testified that in 2008, she learned of the crime on television and became worried because the truck involved in the crime belonged to Mr. Vinet. She worried that her son was somehow involved because Mr. Vinet was living with William. She testified that she later figured out that her son was not involved, and she "kn[e]w positively" that he was not involved because at the time of the incident, William had hit the gas meter at his house. Ms. Verbois testified that she was at his house when he did it, and, in order to avoid having to interact with the police, William left the house and she stayed, called the gas company, and waited for them to send someone to fix the gas meter. Ms. Verbois testified that Jessica Billiot and Mr. Vinet were not present at the house when she was there that day and also testified that she and Jessica Billiot did not go shopping together that day. In addition, Ms. Verbois stated that the police never spoke with her or asked if she had been with Jessica Billiot on the day of the crime.

*Anita Pontiff's Testimony*

Anita Pontiff testified that in 2008, she was exiting her car in the driveway of her home, when her next door neighbor approached the fence that divided their properties. The neighbor asked Ms. Pontiff "if [she] had heard about the incident

that happened the night before." Ms. Pontiff testified that the neighbor then "just blurted out that her daughter was responsible for it. She said her daughter was driving at the time…." Ms. Pontiff testified that she did not know the neighbor very well; that the neighbor had lived next door to her for approximately eight months to one year prior to her making the statement to her; and that she did not know her name.

Additionally, Ms. Pontiff admitted later in 2008, she was arrested on a charge in Jefferson Parish and spent some time in jail before the charge was eventually dismissed. Ms. Pontiff testified that while she was in jail, she met Cheri Hayden, who told Ms. Pontiff that the State had charged her with running over the victim at Laborie's and insisted that she did not do it. Ms. Pontiff testified that she shared with Cheri Hayden what her next door neighbor had previously told her. When asked if Cheri Hayden's attorney ever came to speak with her, Ms. Pontiff replied, "[n]o. I don't remember him coming to see me. …[W]hen I got released, I call [sic] the Innocence Project and told them what I had heard because I thought somebody should at least look into it, you know."

*Jessica Billiot's Testimony*

Cheri Hayden also called Jessica Billiot as a witness at the evidentiary hearing; however, Jessica Billiot invoked her Fifth Amendment rights against self-incrimination and refused to answer any questions.

*Ashly Uhlig's Testimony*

Ashly Uhlig testified that she was a guest in attendance at the birthday party for Cheri Hayden's granddaughter in February 2008. Ms. Uhlig explained that her then boyfriend, now her ex-husband, Raymond Philip Hayden, is Cheri Hayden's nephew. She testified that she and Raymond arrived at the party at around 1:00 p.m. She recalled most of the people she saw at the party, including Cheri Hayden. She testified that Cheri Hayden "was kind of like the host of the party doing everything."

Cheri Hayden was "making sure everyone said happy birthday and had food, presents, that kind of thing." Ms. Uhlig testified that Cheri Hayden "was acting completely normal, taking care of everything, making sure everyone had what they needed…cleaning up after everyone, pretty much how she usually is." Ms. Uhlig testified that until IPNO contacted her, no one representing Cheri Hayden had contacted her or asked her any questions regarding this case. Ms. Uhlig testified that had she been contacted before Cheri Hayden's trial, she would have provided the same information stating, "I feel like it's an obligation…to just say what happened."

*Amy Hayden's Testimony*

Cheri Hayden's daughter, Amy Hayden, also testified at the evidentiary hearing. She testified that in 2008, her mother was a heavy smoker, smoking a pack of cigarettes or more a day. On the day of the crime, Amy Hayden was throwing a birthday party for her daughter. Amy Hayden stated that her mom, her boyfriend at the time, her children, some of her family, including Ashly Uhlig, and "a lot of [her boyfriend's] family," were present at the party. She testified that her mother helped her throw the party. Amy Hayden testified that after her mother was arrested in 2008, she spoke to her mother's attorney, William Doyle; that she told him "everything that had happened…during the party and anything that I knew to help with the case;" and that she told Mr. Doyle who was at the party. Amy Hayden also testified that her mother told her about a woman she had met in jail who knew something about the crime. Based on the information her mother shared, Amy Hayden tried to "find out what the person knew;" she located the address where the person lived; and that she believed the person that lived there was Jessica Billiot's mother. Amy Hayden testified that she shared this information with her mother's attorney, William Doyle.

*William Doyle's Testimony*

Cheri Hayden's court-appointed trial attorney, William Doyle, testified as

follows: he worked for the Jefferson Parish Public Defender's office in 2008 and 2009; he remembered representing Cheri Hayden, but did not have any case notes related to the matter. Mr. Doyle testified that after enrolling as counsel, he reviewed the case file and received open-file discovery; he acknowledged that it is the "defense attorney's responsibility to go over [the case file]." Mr. Doyle testified that "the policy of [the] office" was that once a case was assigned, the attorneys "were given a lot of latitude." He stated that although the office provided investigators to assist in a case, it was required that a special request be made in order for an investigator to be assigned, but the requests were "generally approved."

With respect to Cheri Hayden's case, Mr. Doyle did not request an investigator; as a matter of practice, "[he] would do a lot of [the investigating him]self." Mr. Doyle testified that he believed that because the State had eyewitnesses, the State's case against Cheri Hayden was strong. Prior to trial, Mr. Doyle stated that he did not talk to any of the State's witnesses; he relied on their statements on the witness stand because he "[could]n't cross-examine a piece of paper"; he found in his experience that State witnesses do not want to talk to the defense; and he would have his "bite at the apple when they would take the witness stand." While he remembered that he presented an alibi defense at trial, Mr. Doyle "did not remember a lot about this case." Mr. Doyle did not recall Amy Hayden or any other members of Cheri Hayden's family, and he did not remember if Amy Hayden provided him with any information helpful to her mother's case. Mr. Doyle recalled Jessica Billiot's statement to police that she was with her father on the day of the crime, but he could not recall if he interviewed Jessica Billiot's father; he could not remember if he investigated any of Jessica Billiot's family members; and he could not recall if he interviewed Ms. Verbois, the woman Jessica Billiot claimed she was shopping with at the time of the crime, or Barbara Williams, Jessica Billiot's friend to whom she confessed and who the police interviewed after receiving a tip.

Regarding Cheri Hayden's alibi defense, Mr. Doyle recalled that "most" of the people at the birthday party "were not forthcoming" and "hesitant." He stated that in his experience, "a lot of time witnesses don't want to talk to you." Mr. Doyle testified that he called the witnesses who were "cooperative" and that he believed could corroborate Cheri Hayden's alibi. He recalled that he gave the court date to every alibi witness he spoke to and told them to come to court if they wanted to testify. He testified that some individuals were hesitant "because the store was close to their house and they could not verify that she was [at the party] the whole time." He also testified that it was his "own individual theory" not to subpoena defense witnesses because "they're not going to give you what you want…they may not show, they may change their stories."

*Arguments at Evidentiary Hearing*

Cheri Hayden argued that she was denied effective assistance of counsel in large part because of Mr. Doyle's failure to adequately investigate her case. She alleged that he failed to avail himself of the help of an investigator, failed to interview the State's witnesses, failed to follow-up on leads he received, and failed to investigate Jessica Billiot's changing alibis. In a case that relied entirely on an eyewitness' identification of the perpetrator, Cheri Hayden argued that, at minimum, trial counsel's failure to interview the eyewitnesses fell below the standard of effective representation.

She also argued that the State failed to disclose material evidence in violation of *Brady*, which included: Mr. Pitre's description to officers on the scene that the female driver was young and in her twenties; Ms. Pavia's attempt to report what she knew first-hand, as well as what her daughter shared with her about the crime and Jessica Billiot's involvement; and the circumstances surrounding Ms. Chaisson's identification of Cheri Hayden. She alleged that the undisclosed evidence is favorable and material because it either directly implicates an alternative suspect or

could have been used to impeach the credibility of the State's witnesses. Cheri Hayden argued that the cumulative impact of her trial counsel's ineffective representation, and the State's withholding of favorable evidence, entitles her to a new trial.

Cheri Hayden further argued that in violation of *Napue*,[10] the State presented and failed to correct the false testimony of Lieutenant Meunier, who testified at trial that Mr. Billiot was never considered a suspect or identified by anyone as a suspect. Cheri Hayden argued that the State knew this was false because the investigative report reveals that officers investigated the tip they received regarding Jessica Billiot's involvement and, as a result, Jessica Billiot was informed that she was under investigation, mirandized, and signed an arrestee/suspect waiver of rights form.

Moreover, Cheri Hayden claimed that she is factually innocent under La. C.Cr.P. art. 926.2. She argued that the testimonies and affidavits of Joseph Billiot, Hope Verbois, Anita Pontiff, Reina Rodriguez, Linda Gordon, Jessica Billiot, Sherry Arwood, Amy Hayden, Ashly Uhlig, and Tabitha Chaisson is new, reliable, and noncumulative evidence, which is corroborated with scientific, forensic, and physical evidence, consisting of: the DNA testing results of the cigarettes matched to Jessica Billiot and found in the truck; the coroner's report showing the victim died in the same manner as Jessica Billiot confessed to Linda Gordon and Barbara Williams as having committed, by running over the victim; the victim's discarded purse corroborating the details of eyewitness accounts and Jessica Billiot's confession; and Dr. Nancy Franklin's proffered expert report on memory and eyewitness identification providing valid scientific research to explain why and how the State's witnesses misidentified Cheri Hayden.

In opposition, the State argued as follows: that Cheri Hayden failed to establish credible evidence in support of her claims; that the evidence submitted is

---

[10] *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

not corroborated by evidence in the record or presented at trial; that the testimony and affidavits produced at the hearing are based on hearsay or double hearsay; that it is mere speculation that any of the affiants and witnesses presented at the hearing would have testified at trial; and that Cheri Hayden's trial counsel made a strategic decision to present only an alibi defense because the evidence Cheri Hayden relies on "would have left the jury with only suggestions of [Jessica Billiot's] participation." The State further opposed Cheri Hayden's application, arguing that the testimonial evidence in support of Cheri Hayden's factual innocence claim is unreliable and based on hearsay and thus, inadmissible. The State argued that La. C.Cr.P. art. 926.2 requires that testimonial evidence be corroborated by *new* scientific, forensic, physical, or nontestimonial documentary evidence. The State argued that because the trial court excluded Cheri Hayden's expert report, and the DNA testing results and the coroner's report were admitted at trial, the evidence was not new. Therefore, the State argued that Cheri Hayden failed to carry her burden to prove her factual innocence claim.

*Trial Court's Ruling*

On March 24, 2022, the trial court denied Cheri Hayden's application in a written judgment. The trial court found Cheri Hayden failed to demonstrate that the State withheld *Brady* evidence as it relates to the State's eyewitnesses, finding their testimony and affidavits lacked credibility. The trial court found that Cheri Hayden's claim that the State presented false testimony to be without merit because Lieutenant Meunier testified consistently that, after investigating the tip regarding Jessica Billiot, he learned Jessica Billiot was not a suspect, and he consistently testified that he never considered Jessica Billiot to be a suspect. The trial court also found Cheri Hayden failed to prove her ineffective assistance of counsel claim. The trial court concluded that trial counsel's strategy was to present an alibi defense, and witnesses testified at trial in support of that defense. The trial court reasoned,

however, that "the State had a compelling case with two strong eyewitness identifications" and one of whom maintained that Cheri Hayden was the driver. The trial court further reasoned that, because Cheri Hayden's claim attacked trial counsel's strategic decisions and failed to show she was prejudiced, there was no merit to her ineffective assistance of counsel claim. In light of its finding that the testimony and affidavits lacked credibility, and that Cheri Hayden's arguments were "speculative and not based upon evidence," the trial court also concluded that Cheri Hayden failed to show the collective impact of the alleged ineffective assistance of counsel and the State's alleged failure to turn over favorable evidence.

Adopting the State's interpretation of La. C.Cr.P. art. 926.2, the trial court found that Cheri Hayden was required to present "new, reliable, and non-cumulative" corroborating scientific evidence in support of her factual innocence claim. In that her corroborating evidence was not new evidence, the trial court determined that she failed to prove her factual innocence claim. Cheri Hayden failed to carry her burden of proof pursuant to La. C.Cr.P. art. 930.2. On March 24, 2022, the trial court denied Cheri Hayden post-conviction relief.

Cheri Hayden filed the instant writ application on June 1, 2022, seeking this Court's supervisory review of the trial court's March 24, 2022 denial of her post-conviction relief application.

### STANDARD OF REVIEW

As a general matter, "[t]he petitioner in an application for post[-]conviction relief shall have the burden of proving that relief should be granted." La. C.Cr.P. art. 930.2. La. C.Cr.P. art. 930.3 sets forth the grounds upon which relief shall be granted when the petitioner, as in this case, is in custody after sentence for conviction of an offense. Appellate courts review a trial court's ruling on an application for post-conviction relief for an abuse of discretion. *State v. Henry*, 20-0412 (La. App. 4 Cir. 10/29/20), 307 So.3d 249, 257. "[W]hen a trial court makes findings of fact

based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings." *Id.* (quoting *State v. Thompson*, 11-0915 (La. 5/8/12), 93 So.3d 553, 563). However, when the trial court bases its ruling on an erroneous view of the law, appellate courts apply a *de novo* standard of review. *State v. Henry*, 20-0233 (La. App. 4 Cir. 7/22/20), 302 So.3d 1167, 1169.

The instant writ application assigns as error the trial court's failure to find: (1) that Cheri Hayden received ineffective assistance of counsel; (2) that the State withheld *Brady* material; (3) that the State presented false testimony in violation of *Napue*; (4) that the cumulative impact of the ineffectiveness of trial counsel and the State's *Brady* violations entitle her to a new trial; and (5) that Cheri Hayden has demonstrated her actual innocence under La. C.Cr.P. art. 926.2.

After thorough review of Cheri Hayden's writ application and for the reasons expressed in detail below, we find Cheri Hayden's trial counsel, William Doyle, failed to provide Cheri Hayden effective assistance of counsel as required by the United States and Louisiana Constitutions. In light of our finding, we decline to address the balance of Cheri Hayden's assigned errors.

An ineffective assistance of counsel claim "is a mixed question of law and fact." *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). The trial court's findings of fact are subject to the clearly erroneous standard of review. *Id.* Regardless of what standard we employ, the trial court's erroneous application of the law, and the totality of the evidence presented at the evidentiary hearing, compel our conclusion here.

## DISCUSSION

Cheri Hayden asserts that new and compelling evidence exists that was never presented to the jury that points to her innocence and shows that Jessica Billiot was

the actual driver and perpetrator of the crime. Cheri Hayden alleges that the primary reason the jury never heard the evidence implicating Jessica Billiot was due to her trial counsel's inadequate pre-trial investigation. She submits that her trial counsel, who had limited experience as trial counsel in a murder case, did not avail himself of the use of an investigator, failed to interview witnesses, and left strong leads unexplored. Cheri Hayden contends that once IPNO began investigating her case, following the leads that were neglected and ignored by her trial counsel, as well as conducting in-person witness interviews, she learned of evidence which was both material and favorable to her defense. Specifically, Cheri Hayden points to evidence that Jessica Billiot confessed to several people that she was the one driving the truck when the victim was run over; that Jessica Billiot better matched the description of the young female driver; that Jessica Billiot gave multiple and conflicting alibis as to her whereabouts at the time of the crime; and that the police failed to follow-up and investigate the leads they received that implicated Jessica Billiot as the perpetrator.

**Ineffective Assistance of Counsel**

"Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel." *State v. Casimer*, 12-678 (La. App. 5 Cir. 3/13/13), 113 So.3d 1129, 1141. "A claim of ineffective assistance of counsel is a proper ground on which to seek post-conviction relief as it asserts that the petitioner's 'conviction was obtained in violation of the constitution of the United States or the state of Louisiana.' La.C.Cr.P. art. 930.3(1)." *State v. Jenkins*, 14-1148 (La. App. 4 Cir. 5/6/15), 172 So.3d 27, 33. It is well-established that in order to prove ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Casmir*, 113 So.3d at 1141. A defendant must show: (1) that "counsel's

representation fell below an objective standard of reasonableness;" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id; State v. Joshua*, 50,566 (La. App. 2 Cir. 8/10/16), 201 So.3d 284, 295; *Casimer*, 113 So.3d at 1141. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*, 466 U.S. at 689. Therefore, a reviewing court gives great deference to trial counsel's judgment, tactical decisions, and trial strategy and presumes conduct falls within the wide range of reasonable professional assistance. *Id.*

Trial counsel's performance is deficient when "the attorney's actions [fall] below the standard of reasonableness and competency required for attorneys in criminal cases and is evaluated from the attorney's perspective at the time of the occurrence." *Joshua*, 201 So.3d at 296; *Strickland*, 466 U.S. at 690. In *Strickland*, the Court explained:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, **counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary**. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.*, 466 U.S. at 690-91 (emphasis added).

Additionally, the purpose of the Sixth Amendment right to counsel is to "ensure that a defendant has the assistance necessary to justify reliance on the

outcome of the proceeding." *Id.*, 466 U.S. at 691-92. Thus, the second-prong of the *Strickland* test requires that the counsel's deficient performance must have prejudiced the defense. *Id.* In making this determination, a reviewing court must consider the totality of the evidence presented to the factfinder. In this regard, *Strickland* recognized that not all errors will have the same effect:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. **Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.** Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.*, 466 U.S. at 695-96 (emphasis added).

As a general matter, trial counsel has a duty to make a reasonable investigation. *Joshua*, 201 So.3d at 297. "Counsel's investigative actions and choices may be influenced by information and decisions from the defendant and, under the circumstances of the case, might diminish or eliminate the need for further investigation." *Id.* Thus, the type and extent of pretrial investigation that is required in a case is informed by the facts of the case and the totality of the information known to defense counsel.

Cheri Hayden's trial counsel, William Doyle, testified that he did not recall a lot about Cheri Hayden's case. He had no independent recollection of any conversations he had with Cheri Hayden regarding potential witnesses, or to whom he may have spoken, or what leads he may have investigated. Consequently, we have little evidence of the trial attorney's decision-making process or the manner in which he performed his pre-trial investigation in this case. Nevertheless, we review Cheri Hayden's ineffective assistance of counsel claim under the two-prong test set forth in *Strickland.*

The key issue in this case was identity: Was Cheri Hayden, in fact, the person

who was driving the truck that ran over and killed Ms. Landry? At trial, the defense presented the theory that Cheri Hayden was misidentified as the perpetrator and that someone other than Cheri Hayden had committed the crime. Cheri Hayden supported her defense theory through her own testimony and the testimony of three alibi witnesses, who testified that Cheri Hayden was at her granddaughter's birthday party on the day of the crime that took place in Laborie's parking lot. Cheri Hayden argues she received ineffective assistance of counsel because her trial counsel had notice that a pretrial investigation was necessary, and failed to adequately investigate her case. Cheri Hayden argues that this failure was prejudicial.

The evidence shows that Cheri Hayden's trial counsel was on notice of several potential areas of investigation. We have recounted the evidence presented at trial, and known to Cheri Hayden's trial counsel, in considerable detail above in the Factual Background and Procedural History. We have also detailed the newly discovered evidence which was presented at the evidentiary hearing. For purposes of this section, we find useful to our discussion to group the evidence into the following categories: (1) investigation of the State's witnesses; (2) investigation of an alternative suspect; and (3) investigation of Cheri Hayden's alibi.

*Investigation of State's Eyewitnesses*

Courts have previously found counsel to be ineffective when he fails to interview known witnesses. *See Joshua*, 201 So.3d at 297; *State v. Butler*, 41,985 (La. App. 2 Cir. 6/20/07), 960 So.2d 1208, *writ denied*, 07-1678 (La. 5/9/08), 980 So.2d 685; *State v. Moore*, 48,769 (La. App. 2 Cir. 2/26/14), 134 So.3d 1265, *writ denied*, 14-0559 (La. 10/24/14), 151 So.3d 598; *State v. Potter*, 612 So.2d 953 (La. App. 4th Cir. 1993), *writ denied*, 619 So.2d 574 (La. 1993); *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) ("[C]ounsel's failure to interview eyewitnesses to a charged crime constitutes constitutionally deficient representation").

Having no physical evidence that linked Cheri Hayden to the crime, the

State's case rested solely on eyewitness testimony; thus, the identity of the driver was the critical issue at trial. The police reports, which Mr. Doyle testified he reviewed in preparing Cheri Hayden's defense, included the names of the two witnesses who identified Cheri Hayden as the driver. Yet, Mr. Doyle testified that he did not interview any of the State's witnesses.

Aside from having a general duty to interview known witnesses, trial counsel should have known that there was reason to believe that an investigation and interview of the witnesses would be fruitful. First, despite Mr. Pitre and Ms. Chaisson both having witnessed the crime in the grocery store parking lot, only Ms. Chaisson identified Cheri Hayden. Second, Mr. Pitre testified at the suppression hearing that no one was helping the victim as she struggled over possession of her purse. His testimony contradicted that of Ms. Chaisson, who also testified at the suppression hearing, but stated that she was trying to grab the victim to pull her away.[11] Third, trial counsel also had the statements Ms. Chaisson and Ms. Dutriel gave police in which they both described the age of the female driver as being much younger than Cheri Hayden. In that his defense theory was that Cheri Hayden was misidentified as the driver, any evidence that added to the plausibility of the alternative suspect would have been crucial. Considering the discrepancies relating to the eyewitness descriptions of the female driver, a reasonably competent attorney, prior to trial, would have regarded these interviews as necessary.

In *Potter*, 612 So.2d 953, the defendant was found guilty of second degree murder; his conviction was reversed after the trial court found that the defendant was denied effective assistance of counsel, because counsel failed to investigate, interview and subpoena witnesses, and failed to obtain exculpatory documentary evidence. The Fourth Circuit affirmed the trial court's ruling, finding that the

---

[11] Mr. Doyle was not enrolled as counsel when the suppression hearing took place; however, upon enrolling as counsel, he had a duty to apprise himself of the record and all proceedings and the results thereof.

witness' proposed testimony corroborated the defendant's theory of self-defense, where the witness described how the victim harassed and threatened the defendant. *Id.* at 958. While the Fourth Circuit recognized that it could not know for certain what effect the testimony would have on the jury, the appellate court concluded that "it is not unreasonable to conclude, as did the trial court, that this testimony would probably affect the outcome of the trial." *Id.*

In this case, much of the evidence presented at the evidentiary hearing was the result of basic investigative measures. IPNO Investigator Geylin testified at the evidentiary hearing that she began investigating Cheri Hayden's case by interviewing the State's witnesses and looking into Cheri Hayden's alibi. Had trial counsel investigated and interviewed the State's eyewitnesses, he could have obtained information relevant to Cheri Hayden's defense. At the evidentiary hearing, Mr. Pitre testified that he described the age of the female driver for officers on the scene as a "young girl" in her "twenties." Trial counsel would have learned that Mr. Pitre's description of the driver's age did not match Cheri Hayden. Additionally, trial counsel would have learned that Mr. Pitre did not see Ms. Chaisson helping the victim and questioned the veracity of Ms. Chaisson's account of events, providing trial counsel notice that further investigation of Ms. Chaisson was required given Ms. Chaisson was the only eyewitness to the purse snatching incident who identified Cheri Hayden as the driver.

As the only eyewitness to identify Cheri Hayden as the driver of the truck in the Laborie's parking lot, Ms. Chaisson's truthfulness and her statements were the crux of the trial and the conviction of Cheri Hayden. Had trial counsel interviewed Ms. Chaisson, he could have asked whether she told anyone other than the police about what she observed that day in the parking lot. Such an investigation would have revealed that Ms. Chaisson told her husband, as well as her friend, that she was "too late" to assist the victim, which contradicted her statement to JPSO and her

subsequent trial testimony, but was consistent with Mr. Pitre's version of events. Trial counsel could have presented these inconsistencies at trial to impeach her credibility and undermine her identification.

Moreover, Ms. Chaisson admitted to fabricating portions of her trial testimony and recanted her identification of Cheri Hayden. A reasonable lawyer would have investigated the circumstances of Ms. Chaisson's identification of Cheri Hayden. Had trial counsel questioned Ms. Chaisson about her identification, counsel would have learned that Ms. Chaisson initially told the investigating officers that all the women in the photo array appeared older than the driver she had observed less than 12 hours earlier. Counsel could have learned that Ms. Chaisson felt pressure to make an identification; that officers appeared "eager" for her to make an identification; that one of the officers placed a thumb next to one of the photographs, seeming to suggest that that was the individual the officer wanted her to select; and that she thought it was odd that so many officers appeared at her house at 1:00 a.m. to conduct an identification procedure. With this information, trial counsel could have called into doubt the identification procedures the investigating officers used, as well as the reliability of the State's eyewitness identifications.

Like Ms. Chaisson, Ms. Dutriel described the female driver as "a young girl" in her 20s or early 30s, and yet identified the much older Cheri Hayden. Had Cheri Hayden's trial counsel investigated this discrepancy, as IPNO did, he would have learned that Ms. Dutriel was told by investigators that they had found the suspects and that she needed to make an identification. Counsel would have learned that, despite describing to police that the driver was a young girl, "[Ms. Dutriel] knew that the driver was actually an older woman because all the women shown in the lineup were older than that." Trial counsel would have learned that Ms. Dutriel dismissed her own description of the perpetrator after she was told by the police that they had their suspects and was presented with a lineup of much older women. Cheri

Hayden's trial counsel could have questioned Ms. Dutriel about this discrepancy to undermine her credibility and the reliability of her identification, to suggest that her identification of Cheri Hayden was potentially the product, not of her memory, but a tainted photo identification procedure.

"[T]he failure to interview an eyewitness is not a strategic decision and cannot be likened to a decision not to call a witness who has been interviewed and determined by the attorney to be unhelpful or not credible." *Joshua*, 201 So.3d at 298. In this case, Mr. Doyle admitted he did not interview the State's witnesses, despite being aware of various discrepancies and inconsistencies contained within the evidence in his possession, which a reasonably competent lawyer would have investigated. The fact that State witnesses may be reluctant to speak with the defense, as Mr. Doyle testified, does not justify his failure to interview them. In fact, Mr. Doyle had every reason to interview the State's witnesses. He testified that he believed the State had a strong case because of the eyewitness identifications. A reasonably competent lawyer would have investigated the circumstances of the identification procedures to test the validity of his belief as to the strength of the State's case. Mr. Doyle did not, and the jury never heard evidence of the questionable manner in which the identifications were conducted. Trial counsel's decision not to interview any of the State's eyewitnesses was unreasonable and falls below the standards of a reasonably competent lawyer; thus, counsel's performance was deficient. The State's case relied solely on the jury's finding the State's witnesses to be credible and their identifications of Cheri Hayden to be reliable. Failure to rebut the testimony of the State's witnesses with the inconsistencies of the initial descriptions and subsequent identifications, and failure to present evidence which called into question the reliability of the identifications, meant the jury was led to believe that the strength of the State's case was stronger than the evidence presented during the post-conviction evidentiary hearing now suggests. Therefore,

the failure to interview the State's witnesses and to investigate the identification procedures prejudiced Cheri Hayden's defense.

*Identifiable Alternative Suspect*

Similarly, Mr. Doyle was aware that police had received information identifying Jessica Billiot as an alternative suspect and that this evidence pointed to her involvement. The police report indicates that Jessica Billiot was the subject of a tip JPSO received. In particular, the report stated Barbara Williams told the tipster that Jessica Billiot admitted to driving the truck that ran over the victim. Mr. Doyle was aware that JPSO determined the tip credible enough to warrant additional investigation because JPSO interviewed both Barbara Williams and Jessica Billiot. Additionally, he knew Jessica Billiot provided two statements to the police. Her statements reveal Jessica Billiot gave the police multiple and competing alibis. She also told the police that the owner of the truck was her boyfriend, thereby establishing a connection between her and Mr. Vinet, who had already admitted to his involvement in the crime. Mr. Doyle also knew through eyewitness statements that Jessica Billiot better matched the age description of the driver that the witnesses had provided.

Considering police received a tip that Jessica Billiot had confessed to the crime, gave varying accounts of her whereabouts, admitted to being in a relationship with one of the known perpetrators, and matched the eyewitnesses' description of the driver's age, a reasonably competent attorney would have determined that additional investigation was warranted and necessary. Because counsel's strategy at trial was to present the possibility of an alternative driver, a reasonably prudent attorney would have made some effort to investigate the police's tip, interview Barbara Williams, and verify Jessica Billiot's alibis. Indeed, the failure to conduct such an investigation is unreasonable and made worse considering trial counsel's decision to call Jessica Billiot as a witness at trial. Review of Jessica Billiot's trial

testimony shows that trial counsel's failure to adequately investigate Jessica Billiot in support of the alternative suspect defense, served to hurt Cheri Hayden's case, not help it. A reasonable attorney would not have called Jessica Billiot as a witness without, at the very least, investigating her multiple alibis. A reasonable attorney, charged with representing a defendant facing life imprisonment, would have pursued the leads Mr. Doyle had that supported his alternative suspect theory, and certainly would have pursued those leads which identified the alternative suspect for him. Finding the first prong of *Strickland* satisfied, we turn to the question of prejudice to Cheri Hayden's case.

As a consequence of trial counsel's limited investigation, the jury was unaware that during the course of JPSO's investigation, Jessica Billiot gave conflicting statements to investigators, changing her story multiple times about who she was with and what she was doing at the time of the crime. The jury was also unaware that Jessica Billiot's trial testimony contradicted what she had previously told investigators.

The jury never heard that Jessica Billiot initially told the police that she was with her father around 11:00 a.m. on the day of the crime. At the evidentiary hearing, Jessica Billiot's father indicated that he would have testified at trial that he had not seen his daughter at all that day. Had trial counsel investigated Jessica Billiot's alibi, he could have called Jessica Billiot's father to impeach her credibility. Similarly, while Jessica Billiot told the jury that she had been in Mr. Vinet's truck the morning of the crime, when she spoke with investigators, she denied ever being in Mr. Vinet's truck that day.

Furthermore, at trial, Jessica Billiot told the jury she was shopping with Hope Comeaux when the crime occurred. Yet, in her second statement to the police, Jessica Billiot indicated that she was at home with her roommate when the crime occurred and that it was not until the following day, when Mr. Vinet was arrested,

that she went shopping with Hope Comeaux. Because trial counsel did not adequately investigate Jessica Billiot, the jury was unaware that at trial, Jessica Billiot's story had changed, multiple times in fact, telling the jury, instead, that she was shopping with Hope Comeaux when the crime took place.

The jury was also unaware that the police never tried to confirm Jessica Billiot's changing alibis. If the police had attempted to do so, they would have learned that Hope Comeaux denied shopping with Jessica Billiot on the day of the crime. The police would have also learned that around 1:00 p.m., Jessica Billiot's roommate, William, hit a gas meter in front of his home and left the area to avoid interacting with the police. William's mother, Hope Comeaux, was at the house when it happened and waited for the gas company to arrive and repair the damage. Unable to verify Jessica Billiot's alibis, investigators would have had sufficient information to support further investigation of Jessica Billiot.

Trial counsel's lack of investigation prejudiced Cheri Hayden as he was not prepared to question or impeach Jessica Billiot at trial. Trial counsel admitted to having reviewed the case file and discovery in this case, which included Jessica Billiot's two statements to the police. Her statements were not investigated by the police or trial counsel, and new evidence demonstrates that Jessica Billiot's statements were untrue. Trial counsel would have only needed to speak with two people to learn that Jessica Billiot had provided false alibis. Simply pointing out the inconsistencies of her two statements to police would have impeached the truthfulness of her testimony and could have raised reasonable doubt.

At trial, the jury heard evidence that Jessica Billiot and Cheri Hayden bear no resemblance to one another; that Jessica Billiot was a brunette; that she had never been a blonde; that she was never considered a suspect by law enforcement or anyone else; that she had an alibi for the time of the crime; and that Jessica Billiot herself denied any involvement in the crime.

22-KH-244                                    37

In contrast, the jury did **not** hear that Jessica Billiot confessed to committing the crime to multiple people. Linda Gordon and Reina Rodriguez would have testified that Jessica Billiot confessed to driving the truck that ran over the victim.

The jury did not hear that Jessica Billiot better matched the perpetrator that witnesses saw and described to police immediately after the crime. Throughout the trial, the jury heard that Jessica Billiot had brunette hair. Jessica Billiot testified that she never had blonde hair, and Mr. Vinet echoed these claims. Because Cheri Hayden's trial counsel failed to investigate Jessica Billiot, the jury did not hear the testimony of Hope Comeaux and Linda Gordon. Both women stated that they would have testified that Jessica Billiot had blonde hair in February 2008, and Linda Gordon would have further testified that she witnessed Jessica Billiot dyeing her hair shortly after the crime.

At trial, counsel for Cheri Hayden called Jessica Billiot as a witness in an attempt to present evidence to the jury that Jessica Billiot was the actual perpetrator of the crime. Because Cheri Hayden's counsel failed to adequately investigate Jessica Billiot, he never questioned her about the contradictions and falsehoods of her various alibis. Trial counsel needed only to present evidence that called into doubt the identification of Cheri Hayden as the perpetrator of the crime. He was not required to prove beyond a reasonable doubt that Jessica Billiot was the actual perpetrator.[12] Had trial counsel performed an adequate investigation, counsel could have also presented evidence that the police had failed to confirm Jessica Billiot's alibis in order to call into question the adequacy of the police investigation.

Additionally, to the extent the trial court found the testimonial evidence not

[12] The State argued that the evidence presented at the evidentiary hearing, if it had been presented at trial, "would have left the jury with only the suggestion of [Jessica Billiot's] participation." The State's position implies that the evidence presented on post-conviction relief, if presented at trial, is insufficient to support a viable alternative suspect defense because it only suggests, and does not prove beyond a reasonable doubt, that Jessica Billiot was the perpetrator. The implication of the State's argument is not only wrong, but it also supports the merits of Cheri Hayden's argument that the evidence, had it been presented at trial, would have impacted how the jury viewed the strength of the State's case.

credible, it is worth mentioning that Jessica Billiot now states that her prior alibis, including her trial testimony, were all lies.[13]

A confession by a third party to committing the crime of which defendant has been convicted is clearly material to a genuine issue in this case, since the only issue was the identity of the driver. Learning that someone else, who better matched the perpetrator the witnesses saw and described to the police immediately afterwards, had confessed to the crime, and admitted lying to the police multiple times about her whereabouts, would have indeed changed the evidentiary picture of the State's case against Cheri Hayden.

*Cheri Hayden's Alibi Defense*

While the record shows Mr. Doyle called Cheri Hayden's father, stepmother, and daughter as alibi witnesses, Cheri Hayden had also provided Mr. Doyle with the names of other individuals who attended the party. At the evidentiary hearing, Mr. Doyle testified that "most" of the individuals he spoke to who attended the party were "hesitant" and "not forthcoming." Counsel was aware early in the proceedings that Cheri Hayden wished to pursue an alibi defense, and that he had access to the assistance of an investigator, but he never requested one. Despite Cheri Hayden's alibi that she was at her granddaughter's birthday party with a number of family and friends, trial counsel limited his presentation to the three witnesses who were closest to Cheri Hayden.

Courts have previously recognized that "when trial counsel fails to investigate and present an alibi witness, '[t]he difference between the case that was and the case that should have been is undeniable.'" *Caldwell v. Lewis*, 414 Fed.Appx. 809, 818 (6th Cir. 2011) (internal citations omitted). Eyewitness identification evidence, as

---

[13] As part of its investigation and preparation of this application for post-conviction relief, IPNO interviewed Jessica Billiot. The audio recording and transcript were attached as an exhibit to Cheri Hayden's 2018 application for post-conviction relief, and the State introduced the transcript into evidence at the February 2022 evidentiary hearing.

the State presented in this case, "is precisely the sort of evidence that an alibi defense refutes best." *Griffin v. Warden, Maryland Corr. Adjustment Ctr.*, 970 F.2d 1335, 1359 (4th Cir. 1992).

Although we refrain from drawing any conclusion as to the truthfulness of Cheri Hayden's alibi, we nevertheless point out that the inherent difficulty with her alibi that she was at her granddaughter's birthday party, is that her best alibi witnesses were close family and friends in attendance at the party. A jury is generally less likely to credit the testimony of a defendant's family members and close friends, who may have more reason to lie, as opposed to the testimony of a disinterested witness. Trial counsel failed to do more to follow up with party attendees who his client said were present and to locate other attendees Cheri Hayden may not have mentioned. Trial counsel testified that while he could not recall which potential alibi witnesses he spoke to, he stated that he gave the court date to every witness he spoke to and told them to come to court if they wanted to testify. He further indicated that it was his practice not to subpoena defense witnesses because "they're not going to give you what you want," "they may not show," or "they may change their stories." Nevertheless, the compulsory process has power when it is used. Here, IPNO served subpoenas on a number of witnesses. Many of those witnesses willingly signed affidavits, appeared in court, and testified at the evidentiary hearing, even those witnesses the State claims were uncooperative. In light of the severity of the charged offense and the life sentence Cheri Hayden faced, it is unreasonable for counsel to simply provide potential alibi witnesses with a date to appear at court if they wanted to testify. Even considering that some of the alibi witnesses Mr. Doyle spoke to were "hesitant" to testify, because Cheri Hayden claimed to be at her granddaughter's party with family and friends, even just one more witness, like Ashly Uhlig, would have bolstered her defense.

In February 2008, Ashly Uhlig was dating Cheri Hayden's nephew. She

testified that no one representing Cheri Hayden contacted her until IPNO did. She testified that had she been contacted before the trial, she would have testified that she recalled most people at the party, including Cheri Hayden. Ashly Uhlig could have provided trial counsel with the names of other potential alibi witnesses. Ashly Uhlig would have also bolstered the testimony of Cheri Hayden's other alibi witnesses because, as the girlfriend of Cheri Hayden's nephew, Ms. Uhlig would have been presented as a more disinterested alibi witness than Cheri Hayden's father, stepmother, and daughter. Ms. Uhlig would have testified that Cheri Hayden was acting as the host of the party, "making sure everyone had what they needed," "acting completely normal, [and] taking care of everything." Her testimony would have been valuable for the jury's comparison of how Cheri Hayden and Jessica Billiot were acting on the day the crime took place and particularly in the hours immediately thereafter.

Given the seriousness of the offense and gravity of the punishment, trial counsel's alibi investigation was unreasonably limited in this case. Similarly, considering the potential damaging effect that presentation of an incomplete or vulnerable alibi defense could cause, it stands to reason that trial counsel had a duty to do more to investigate Cheri Hayden's alibi defense. A reasonably competent attorney would have done more to procure additional alibi testimony, particularly of at least one witness who would have appeared less biased than the three family members Cheri Hayden was with at the party.

Opposing Cheri Hayden's application for post-conviction relief, the State claims that trial counsel made a strategic decision to present the only viable defense he had, an alibi defense. The difficulty with the State's contention that trial counsel made a strategic decision to present only an alibi defense is that trial counsel did not present just an alibi defense. He also presented an alternative suspect defense. As a consequence of his limited investigation, however, trial counsel was unprepared to

present this additional theory with any success. The only evidence the jury heard that tended to suggest Jessica Billiot as the perpetrator was that she was Mr. Vinet's girlfriend, that she sometimes drove his truck, and that her DNA was found on the cigarettes inside the truck. Jessica Billiot's testimony was left largely unchallenged, forfeiting the opportunity to question the accuracy of her testimony, which Jessica Billiot, herself, admits was false. The failure to adequately investigate Jessica Billiot deprived Cheri Hayden of a substantial argument at trial, leaving little to persuade the jury that Cheri Hayden was misidentified. Cheri Hayden and three members of her immediate family became the sole source of evidence to counter the State's case.

It bears emphasizing that without physical evidence to connect Cheri Hayden to the truck, eyewitness testimony was the most incriminating evidence the State had against Cheri Hayden. At trial, the State offered the jury two eyewitnesses, who testified to seeing Cheri Hayden driving the truck that killed Ms. Landry and crashed into Ms. Dutriel's vehicle. Because trial counsel failed to conduct an adequate pretrial investigation, the State's evidence went largely unchallenged, and in doing so, reasonably supported the State's assertion that Cheri Hayden was the perpetrator. The second prong of *Strickland*, however, requires us to consider the evidence to determine what might have been but for trial counsel's deficient performance.

In its consideration of *Strickland*, the trial court improperly conducted a separate and independent sufficiency of the evidence test. That is to say, in considering the sufficiency of the evidence, the trial court incorrectly rendered a determination as to the weight and credibility of the evidence as it related to Cheri Hayden's guilt. Yet, the question before the reviewing court under the second prong of *Strickland* is not whether the evidence is sufficient to demonstrate Cheri Hayden's guilt or innocence, but whether her trial counsel's failure to conduct an adequate pretrial investigation would have reasonably affected the outcome of the jury's verdict.

The trial court adopted the State's claim that the evidence presented at the evidentiary hearing was inadmissible or not corroborated by other evidence presented at trial. The trial court further determined that even if the evidence was admissible, the evidence against Cheri Hayden was strong. We disagree.

Review of the State's case at trial, as compared to the defense that might have been, shows the stark contrast between the narratives the jury could have considered. The State's case consisted of Ms. Chaisson's identification of Cheri Hayden as the driver in the grocery store parking lot; Ms. Dutriel's identification of Cheri Hayden as the driver that crashed into her vehicle; and Mr. Vinet's testimony implicating Cheri Hayden. Additionally, while the jury learned of Jessica Billiot and some information about her, the only evidence the jury heard that inculpated Jessica Billiot was that she was Mr. Vinet's girlfriend and that her DNA was found on cigarette butts found inside the truck.

By contrast, the evidence presented in Cheri Hayden's application for post-conviction relief highlights the many weaknesses of the State's case. While there was no physical evidence linking Cheri Hayden to Mr. Vinet's truck, physical evidence linked Jessica Billiot, Mr. Vinet's girlfriend, to his truck. Jessica Billiot's DNA was found inside the truck; she admitted to driving his truck on occasions despite not having a driver's license; she fit the description given by eyewitnesses; she dyed her hair frequently; witnesses recalled Jessica Billiot having blond hair in February 2008 and dyeing her hair shortly after the crime; witnesses testified that Jessica Billiot was always with Mr. Vinet and that they used drugs together; she gave the police multiple alibis, which they never confirmed; Jessica Billiot admitted that she lied under oath at trial about her alibi; police considered her a suspect; Jessica Billiot's mother told her neighbor, Ms. Pavia, that her daughter had committed the crime; Jessica Billiot's father suspected his daughter's involvement in the crime because of her relationship with Mr. Vinet and because she avoided his questions

about it; witnesses noticed Jessica Billiot was acting nervous and terrified; she was seen frantically packing her bags shortly after the crime took place; and Jessica Billiot confessed to multiple people that she had committed the crime, including her cousin, Ms. Rodriguez.

Moreover, Ms. Chaisson, the State's star witness—who has no connection to Cheri Hayden and stands to gain nothing from recanting her trial testimony—admitted that she lied under oath about her identification of Cheri Hayden. Furthermore, there is evidence that raises doubt as to the reliability of the eyewitness identifications based on the manner in which they were conducted. Ms. Chaisson testified to the suggestive nature in which her identification was conducted; the investigating lieutenant admitted that current procedures that ensure the accuracy and reliability of identifications were not, at that time, in place; the investigators who suspected Cheri Hayden as the perpetrator also conducted the identifications; both Ms. Chaisson and Ms. Dutriel were told that the police already had their suspect before viewing the photo array; and Ms. Dutriel told IPNO's investigator that she abandoned her initial description of the woman she recalled seeing only after she was told by police that they had their suspects and viewing a photo array of women who were decades older. Additionally, all three eyewitnesses (Ms. Chaisson, Ms. Dutriel, and Mr. Pitre) described the female driver as being "young," and in her twenties or thirties, a description which neither comports with Cheri Hayden's actual age in 2008 or her perceived age at the time, as her appearance suggested she was even older than she truly was.

The evidence Cheri Hayden presents in support of her claims is material, much of which was discoverable had trial counsel pursued and investigated the information and leads he had in his possession. Considering Cheri Hayden's trial counsel had very little experience defending a client facing life imprisonment and the numerous areas of her case that required an adequate investigation, trial counsel

was grossly unprepared to defend Cheri Hayden at trial. Likewise, trial counsel had prematurely concluded that the State's case was stronger than it was because of the eyewitness identifications. This resulted in trial counsel limiting the comprehensiveness of his pretrial investigation, which infected the entire trial and left the jury to consider a woefully incomplete defense.

In light of the wealth of mitigating evidence that was readily discoverable, as set forth above, the opportunity was lost to question the adequacy of the police investigation; to challenge the accuracy of the identifications; to call into doubt the truthfulness of the State's witnesses; and to suggest a more viable alternative suspect. Based on our thorough review of the record and evidence, we find there is a reasonable probability that, but for trial counsel's deficient performance, the result in Cheri Hayden's case would have been different. In accordance with this finding, we conclude that Cheri Hayden's constitutional rights to a fair trial and effective assistance of counsel were violated. Pursuant to *Strickland*, Cheri Hayden's conviction and sentence are vacated, and she is granted a new trial.

In that we find Cheri Hayden is entitled to a new trial based on the breadth of trial counsel's deficient performance and the severity of its impact on Cheri Hayden's defense, our finding leads us to pretermit discussion of Cheri Hayden's remaining claims for post-conviction relief.

### *CONCLUSION*

The record in Cheri Hayden's case is replete with evidence supportive of Cheri Hayden's entitlement to a new trial; and although the inadequate police investigation and the prosecution's withholding of material and favorable evidence in this case merit granting Cheri Hayden a new trial, we find that the real harm to Cheri Hayden's case was the deficient performance of Cheri Hayden's trial counsel. We are convinced by the totality of the evidence presented at the evidentiary hearing that the lack of thoroughness of trial counsel's investigation, preparation, and

presentation of his misidentification theory was catastrophic to Cheri Hayden's defense. Because we find that trial counsel's unprofessional errors so upset the adversarial balance between the defense and the prosecution, we find Cheri Hayden did not receive the fair trial she is constitutionally entitled to and the verdict rendered in this case suspect. But for trial counsel's ineffective assistance of counsel, there is a reasonable probability that the outcome in this case would have been different. Therefore, we find the gravity and cumulative impact of trial counsel's pre-trial investigative failures constitute ineffective assistance of counsel, which violated Cheri Hayden's constitutional rights and warrants granting her a new trial. In that we find Cheri Hayden is entitled to a new trial based on the breadth of trial counsel's deficient performance and the severity of its impact on Cheri Hayden's defense, we pretermit discussion of Cheri Hayden's remaining claims for post-conviction relief.

## *DECREE*

Accordingly, we grant Cheri Hayden's writ application, vacate her conviction and sentence, and remand the matter for a new trial.

**WRIT GRANTED; CONVICTION AND SENTENCE VACATED;
NEW TRIAL GRANTED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 26, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 22-KH-244

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN D. ENRIGHT, JR. (DISTRICT JUDGE)
CHARELL D. ARNOLD (RELATOR)          ANNE M. WALLIS (RESPONDENT)          THOMAS J. BUTLER (RESPONDENT)

### MAILED
JEE Y. PARK (RELATOR)
ATTORNEY AT LAW
INNOCENCE PROJECT NEW ORLEANS
4051 ULLOA STREET
NEW ORLEANS, LA 70119

HONORABLE PAUL D. CONNICK, JR.
(RESPONDENT)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053